AURORA MARITIME CO. and Medmar, Inc., Plaintiffs–Appellees,

v.

ABDULLAH MOHAMED FAHEM & CO., Defendant.

The Hongkong & Shanghai Banking Corporation Limited, Garnishee–Appellant.

No. 1102, Docket 95–7820.

United States Court of Appeals, Second Circuit.

Argued Feb. 2, 1996.

Decided May 20, 1996.

---

David R. Gelfand, Milbank, Tweed, Hadley & McCloy, New York City (Russell E. Brooks, of counsel), for Garnishee–Appellant.

Thomas L. Tisdale, Tisdale & Associates, New York City (Patrick F. Lennon, of counsel), for Plaintiffs–Appellees.

Before: OAKES, KEARSE, and WINTER, Circuit Judges.

WINTER, Circuit Judge:

The Hongkong and Shanghai Banking Corporation Limited ("HSBC") appeals from Judge Sotomayor's denial of HSBC's motion to vacate various Supplemental Admiralty

Rule B attachments of Abdullah Mohamed Fahem & Co.'s ("Fahem") account with HSBC in favor of a state law set-off right created by New York Debtor and Creditor Law Section 151. We hold that Section 151 is preempted by Rule B and affirm.

The facts relevant to this appeal may be simply stated. Aurora Maritime Company and Medmar, Inc. entered into an agreement with Fahem to transport grain from United States ports to Yemen. Disputes concerning performance arose and were submitted to arbitration in London, England. Aurora and Medmar prevailed. On January 26, 1994, Aurora served HSBC with supplemental process of maritime attachment and garnishment under Rule B and attached Fahem's account with HSBC. At that time, Fahem's account had a balance of $633,713.39. During mid-May 1994 and on several subsequent occasions, Medmar served HSBC with similar Rule B process of maritime attachment.[1] Fahem has been indebted to HSBC in excess of $56 million at all pertinent times. HSBC moved on June 24, 1994 for an order vacating Aurora's attachment so that HSBC could exercise a right of set-off against Fahem's account under Section 151. The district court treated the motion as having been made in both the Aurora and Medmar actions and denied it. It held that "[b]ecause plaintiffs obtained Rule B attachments before HSBC exercised its set-off rights under Section 151, plaintiffs gained a limited property interest under federal law that cannot be defeated by a subsequently executed state law set-off right." *Aurora Maritime Co. v. Abdullah Mohamed Fahem & Co.*, 890 F.Supp. 322, 329 (S.D.N.Y.1995). The district court *sua sponte* certified its orders in both the Aurora and Medmar actions for immediate interlocutory appeal under 28 U.S.C. § 1292(b). We agreed to hear the consolidated appeal.

Section 151 permits debtors such as HSBC "to set off and apply against any indebtedness, whether matured or unmatured, of [a] creditor to [the] debtor, any amount owing from such debtor to such creditor, at or at any time after [the issuance of the warrant of attachment]." N.Y. Debt. & Cred. Law § 151. Perhaps more important for purposes of this appeal,

> the aforesaid right of set off may be exercised by such debtor against such creditor or ... attachment creditor of such creditor, ... notwithstanding the fact that such right of set off shall not have been exercised by such debtor prior to the making, filing or issuance, or service upon such debtor of [a warrant of attachment].

*Id.* A garnishee's Section 151 set-off right is, therefore, "superior to the rights of intervening judgment creditors and may be exercised even after the judgment creditor has undertaken enforcement of his claim against the judgment debtor.... [T]he arsenal of [state law] enforcement mechanisms under CPLR article 52, clearly [is] subject to the superior right of setoff [provided in Section 151]." *Aspen Indus., Inc. v. Marine Midland Bank*, 52 N.Y.2d 575, 582, 421 N.E.2d 808, 812, 439 N.Y.S.2d 316, 320 (N.Y.1981), *quoted in* 890 F.Supp. at 327. The district court held, as a matter of statutory construction, however, that a Section 151 lien priority did not apply to a federal attachment under Rule B. Acknowledging that no federal court had decided this precise issue, the court looked to our opinion in *United States v. Sterling Nat'l Bank & Trust Co. of New York*, 494 F.2d 919 (2d Cir.1974), and concluded that the Section 151 lien priority "is only in relation to other 'enforcement devices' existing under New York State law." 890 F.Supp. at 328 (quoting *Aspen*, 52 N.Y.2d at 582, 439 N.Y.S.2d 316, 421 N.E.2d 808). It went on to hold that

> [u]nder either § 151 or Rule B, ... a property interest is created only when a party complies with the dictates of the rule; e.g., a party must execute its right of set-off under § 151 in order to gain a recognizable legal interest in a debtor-depositor's account. Because plaintiffs obtained Rule B attachments before HSBC exercised its set-off rights under § 151, plaintiffs gained a limited property interest under federal law that cannot be defeated by a subsequently executed state law set-off right.

---

1. Appellees informed us that there is a dispute over whether Medmar successfully attached Fahem's accounts with HSBC. This issue does not, however, affect the disposition of this appeal.

890 F.Supp. at 329. The district court did not, therefore, reach the question of whether Section 151 was preempted by Rule B and found instead that the appellees' first-in-time Rule B attachments had priority over HSBC's later-executed set-off right.

We do not agree with the district court's conclusion that HSBC's set-off right and appellees' Rule B attachments do not conflict. First, we see nothing in *Aspen* or the statutory language of Section 151 to indicate that Section 151's set-off right was intended to have priority only over enforcement devices provided by New York law. Second, we disagree with the district court regarding the thrust of *Sterling*. Unlike the instant matter, which the district court characterized as one of "lien priority," 890 F.Supp. at 327, "the defense of lien priority [was] not before us" in *Sterling*, 494 F.2d at 921. The issue in *Sterling* was, rather, whether the existence of a Section 151 set-off right meant that the bank was not holding the "property" of the taxpayer. If the bank was deemed not to hold such "property," it would have a defense for failing to comply with an I.R.S. demand. We held that "[t]he literal language of § 151 . . . would indicate that the full amount in the account is the customer's property," at least "[u]ntil the bank acted to restrict his right to draw on the funds." 494 F.2d at 922. The issue presented by this case is whether Section 151 invests a garnishee with a lien senior to a Rule B attachment. *Sterling* is, therefore, inapplicable.

■ Section 151 plainly indicates that HSBC is permitted to set off Fahem's loan obligation to it "notwithstanding the fact that such right of set off shall not have been exercised by [HSBC] prior to [Aurora's and Medmar's] making, filing or issuance, or service" of a warrant of attachment. We must, therefore, decide whether such a result is preempted by federal law. We conclude that it is.

The parties agree that the preemption issue is governed principally by *American Dredging Co. v. Miller*, 510 U.S. 443, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994). In *American Dredging*, the Supreme Court reiterated that one consequence of exclusive federal admiralty jurisdiction is that state courts "may not provide a remedy *in rem* for any cause of action within the admiralty jurisdiction," *id.* at ——, 114 S.Ct. at 985 (quoting *Red Cross Line v. Atlantic Fruit Co.*, 264 U.S. 109, 124, 44 S.Ct. 274, 277, 68 L.Ed. 582 (1924)) (internal quotation marks omitted), but that when a state court exercises *in personam* jurisdiction, it may "adopt such remedies, and . . . attach to them such incidents, as it sees fit so long as it does not attempt to make changes in the substantive maritime law," 510 U.S. at ——, 114 S.Ct. at 985 (quoting *Madruga v. Superior Court of California*, 346 U.S. 556, 561, 74 S.Ct. 298, 301, 98 L.Ed. 290 (1954)) (internal quotation marks and citations omitted). *American Dredging* also noted that a state remedy is preempted when it "works material prejudice to the characteristic features of the general maritime law or interferes with the proper harmony and uniformity of that law in its international and interstate relations." 510 U.S. at ——, 114 S.Ct. at 985 (quoting *Southern Pacific Co. v. Jensen*, 244 U.S. 205, 216, 37 S.Ct. 524, 529, 61 L.Ed. 1086 (1917)) (internal quotation marks omitted). In our view, Section 151 does both.

■ Maritime attachment is by any test a "characteristic feature of the general maritime law." Although the present Rule B was promulgated under the Rules Enabling Act, 28 U.S.C. § 2071 *et seq.*, maritime attachment is a feature of admiralty jurisprudence that antedates both the congressional grant of admiralty jurisdiction to the federal district courts and the promulgation of the first Supreme Court Admiralty Rules in 1844. *See Manro v. Almeida*, 23 U.S. (10 Wheat.) 473, 487–89, 6 L.Ed. 369 (1825); 7A James W. Moore *et al.*, *Moore's Federal Practice* ¶ B.02 (2d ed.1995). Indeed, the Supreme Court has recognized that "[t]he use of the process of attachment in civil causes of maritime jurisdiction by courts of admiralty . . . has prevailed during a period extending as far back as the authentic history of those tribunals can be traced." *Atkins v. The Disintegrating Co.*, 85 U.S. (18 Wall.) 272, 303, 21 L.Ed. 841 (1873). Rule B is simply an

extension of this ancient practice. *See Maryland Tuna Corp. v. The MS Benares,* 429 F.2d 307, 321 (2d Cir.1970). It is also self-evident that the maritime attachment is not merely well established in admiralty, but that it is a unique, characteristic feature of that branch of our law. *See Schiffahartsgesellschaft Leonhardt & Co. v. A. Bottacchi S.A. De Navegacion,* 732 F.2d 1543, 1549 (11th Cir.1984) (admiralty rules' "lineage sets them apart from common law based sequestration, garnishment, and attachment laws"); *Grand Bahama Petroleum Co. v. Canadian Transp. Agencies,* 450 F.Supp. 447, 453 (W.D.Wash. 1978) ("maritime attachment is part and parcel of admiralty jurisprudence and has its justification in the maritime context"); Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty,* § 1–12, at 36 (2d ed. 1975) ("The maritime lien differs from others in that it is (at least as far as ships are concerned) entirely independent of possession, is non-consentual, and is commonly said not to be extinguished by transfer to a bona fide purchaser without notice of its existence.") (footnotes omitted). Maritime attachment is, therefore, a "characteristic feature of the general maritime" law within the meaning of *American Dredging.*

 Section 151 also materially interferes with important purposes, and reduces the effectiveness, of maritime law. The rationale underlying maritime attachment is twofold. First, attachment provides a means to assure satisfaction if a suit is successful. *See, e.g., Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.,* 339 U.S. 684, 693, 70 S.Ct. 861, 867, 94 L.Ed. 1206 (1950); *Chilean Line Inc. v. United States,* 344 F.2d 757, 760 (2d Cir.1965). HSBC seizes on this fact to argue that Rule B is merely a "procedural" rule that does not affect a litigant's "substantive right to recover," and thus does not warrant preemption under *American Dredging.* However, this argument ignores the second purpose of maritime attachment, namely, to insure a defendant's appearance in an action, *see Swift,* 339 U.S. at 693, 70 S.Ct. at 867, an aspect of attachment inextricably linked to a plaintiff's substantive right

to recover. As the Supreme Court has noted,

> [t]o compel suitors in admiralty (when the ship is abroad and cannot be reached by a libel *in rem*) to resort to the home of the defendant, and to prevent them from suing him in any district in which he might be served with a summons or his goods or credits attached, would not only often put them to great delay, inconvenience and expense, but would in many cases amount to a denial of justice.

*In re The Louisville Underwriters,* 134 U.S. 488, 493, 10 S.Ct. 587, 589, 33 L.Ed. 991 (1890). Without maritime attachment, defendants, their ships, and their funds could easily evade the enforcement of substantive rights of admiralty law. By permitting a bank to set off amounts owed to it against a defendant's account notwithstanding an earlier maritime attachment, therefore, Section 151 threatens to undermine the power of federal admiralty courts sitting in New York to enforce substantive admiralty law. In effect, an admiralty defendant with a New York bank account may enjoy the beneficial use of its account by borrowing from the bank without fear of the account serving as a vehicle for the enforcement of maritime rights against it. Were other states to adopt measures similar to Section 151, the enforcement of admiralty law in the United States would be substantially undermined.

Permitting Section 151 set-off rights to displace an existing Rule B attachment would, therefore, undermine the consistent nationwide application of Rule B, resulting in a concomitant decline in the usefulness of admiralty law to the maritime community. In so concluding, we do not endorse uniformity for uniformity's sake, but rather recognize that it is both inevitable and tolerable that there be some lack of uniformity in maritime law due to state legislation. *See Jensen,* 244 U.S. at 216, 37 S.Ct. at 529. Nevertheless, given the importance of maritime attachment in light of the reasons discussed above, leaving the functional usefulness of Rule B attachments to the vagaries of the laws of fifty states would create a mea-

sure of anarchy in a federal scheme designed to insure that maritime actors may be sued where their property is found. Such anarchy would be inconsistent with an ancient purpose of admiralty law in providing convenient fora for those who want to enforce rights under maritime law against hard-to-catch defendants. It would also be detrimental to international commerce. Indeed, in light of the mobility of maritime defendants and their capital, permitting Section 151 to trump Rule B attachments would undermine "a rule upon which maritime actors rely in making decisions about primary conduct—how to manage their business and what precautions to take." *American Dredging*, 510 U.S. at ———–———, 114 S.Ct. at 988–89.

We therefore affirm.