**WINTER STORM SHIPPING, LTD., Plaintiff,**

v.

**TPI, a/k/a Thai Petrochemical, Industry Public Company Limited, Thai Petrochemical Industry PCL, TPI Oil (1997) Co., Ltd and TPI Oil Co. Ltd., Defendant.**

No. 01 CIV 5650 SAS.

United States District Court,
S.D. New York.

Jan. 14, 2002.

Patrick F. Lennon, Tisdale & Lennon LLP, New York City, for Plaintiff.

John J. Sullivan, Hill Rivkins & Hayden LLP, New York City, for Defendant.

### *OPINION AND ORDER*

SCHEINDLIN, District Judge.

On June 21, 2001, Winter Storm Shipping, Ltd. ("Winter Storm") applied *ex parte* for an order of maritime attachment pursuant to the Federal Arbitration Act, 9 U.S.C. § 8 ("FAA"), and Rule B(1) of the Supplemental Rules for Certain Admiralty and Maritime Claims ("Rule B" or "Rule B(1)"). The order of attachment was granted the same day. *See* 6/21/01 Ex

Parte Order for Process of Maritime Attachment, No. 01 Civ. 5650 ("Order of Attachment" or "Order").

Defendants Thai Petrochemical Industry and the other defendants (collectively, "TPI") now move to vacate the attachment of funds held by The Bank of New York ("BONY") in a suspense account. For the reasons set forth below, TPI's motion to vacate the attachment and to dismiss the complaint is granted.

## I. BACKGROUND

In February 2001, TPI, a Thai corporation, entered into a maritime contract to charter the M/V Nimenia ("the ship") from Winter Storm, a foreign corporation with a place of business in Malta. *See* Verified Complaint ("Compl.") ¶¶ 2–4. According to Winter Storm, TPI breached the contract on March 7, 2001, at a port in Saudi Arabia by loading "non-contractual cargo crude oil" onto the ship. *See id.* ¶ 5. Winter Storm further alleges that TPI failed to pay freight costs of $205,757.90 as required by the contract. *See id.* ¶ 7. It is this sum, to which interests, costs and fees have been added for a total of $361,621.58, that Winter Storm seeks to recover in an arbitration instituted in London. Both parties have now appointed arbitrators, and the arbitration is proceeding. *See* Plaintiff's Opposition to Defendants' Motion to Vacate the Attachment and Dismiss the Complaint ("Pl.Opp.") at 1.

On June 21, 2001, Winter Storm brought an action in this Court to secure its claims in the London proceeding under the FAA and Rule B(1). Satisfied that plaintiff made a *prima facie* showing under Rule B by filing a verified complaint and an affidavit stating that defendants could not be found in this district, *see infra* Part II, this Court issued an order of attachment enabling Winter Storm to attach TPI's assets in this district. *See* Order of Attachment. The Order provided that

> process of maritime attachment and garnishment shall issue against all goods, chattels, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, belonging to, claimed by or being held for the Defendant by any garnishees within this district, including Chase Manhattan Bank, in an amount up to and including $361,621.58.

*Id.* at 2. Pursuant to the order, Winter Storm served various garnishees, including BONY. *See* Defendants' Memorandum of Law to Support its Motion to Vacate and Dismiss ("Def.Mem.") at 1. Winter Storm served BONY with a writ of maritime attachment on June 28, 2001, at 10:30 a.m., 12:15 a.m., and 4:44 p.m.; three more times on June 29, 2001; and, following a weekend during which banks were closed, on July 2, 2001 at 10:58 a.m. *See* Pl. Opp. at 2.

Winter Storm succeeded in arresting a wire transfer ("electronic fund transfer" or "EFT") initiated by TPI. At some point prior to July 2 at 6:48 a.m. (Eastern Standard Time), TPI had instructed its bank in Thailand, the Bank of Ayudhya, to transfer funds from TPI's account to an account at the Royal Bank of Scotland in London. *See* Defendants' Reply in Support of its Motion to Vacate ("Def.Reply") at 3. At 6:48 a.m. on July 2, in its capacity as an intermediary between the Thai and British banks, BONY received a payment order from the Bank of Ayudhya via the SWIFT electronic funds transfer system. *See* Pl. Opp. at 2. BONY debited the Bank of Ayudhya's account and, aware of earlier writs of attachment served by plaintiff, placed the sum of $361,621.58 in a suspense account. *See id.*

## II. LEGAL STANDARD

Courts order maritime attachment pursuant to the FAA, 9 U.S.C. § 8, and Rule

B(1).[1]  Rule B is properly invoked when a plaintiff files (1) a verified complaint *in personam* sufficient to make a *prima facie* showing that the plaintiff has a maritime claim against the defendant in the amount sued for, and (2) an affidavit swearing that the defendant is not present in the district. Supp. R. B(1); *see also* 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 21-2 at 471 (2d ed.1999).

■ Because TPI has moved to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), this Court must accept as true all material factual allegations in the complaint. *See Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir.1992). The party asserting jurisdiction, however, bears the burden of demonstrating that such jurisdiction exists. *See Shipping Fin. Serv. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir.1998). Winter Storm thus bears the burden of demonstrating why the attachment, which is the basis for this Court's jurisdiction over TPI, should not be vacated. *See* Fed.R.Civ.P. E(4)(f); *Maritima Petroleo E Engenharia, LTDA v. Ocean Rig I AS*, 78 F.Supp.2d 162 (S.D.N.Y. 1999).

## III. GENERAL PRINCIPLES OF MARITIME ATTACHMENT

Maritime attachment is an ancient remedy that has become a "characteristic feature" of the general maritime law. *Aurora Maritime Co. v. Abdullah Mohamed Fahem & Co.*, 85 F.3d 44, 47 (2d Cir.1996) (citing *American Dredging Co. v. Miller*, 510 U.S. 443, 447–48, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994)). Maritime law itself is a separate body of substantive and proce-

dural law, distinct from common law. *See* U.S. Const. art. III, § 2; *see also Schiffahartsgesellschaft Leonhardt v. Bottacchi S.A.*, 773 F.2d 1528, 1533 (11th Cir.1985). The present Rule B, promulgated under the Rules Enabling Act, 28 U.S.C. §§ 2071–77, is "simply an extension of [the] ancient practice" of maritime attachment. *Aurora*, 85 F.3d at 47–8.

Rule B and its predecessors provide for attachment when the defendant cannot be found within the district because:

> to compel suitors in admiralty (when the ship is abroad and cannot be reached by a libel in rem) to resort to the home of the defendant, and to prevent them from suing him in any district in which he might be served with a summons or his goods or credits attached, would not only often put them to great delay, inconvenience and expense, but would in many cases amount to a denial of justice.

*Id.* at 48 (citing *In re Louisville Underwriters*, 134 U.S. 488, 493, 10 S.Ct. 587, 33 L.Ed. 991 (1890)). In the absence of this practice, "defendants, their ships, and their funds could easily evade the enforcement of substantive rights of admiralty law." *Aurora*, 85 F.3d at 47. *See also Polar Shipping, Ltd. v. Oriental Shipping Corp.*, 680 F.2d 627, 637 (9th Cir.1982) ("A ship can quietly slip its moorings and depart the jurisdiction. It can easily take with it such tangible property as may be within the jurisdiction. And credits can be quickly transferred elsewhere.").

Rule B serves two purposes: to provide a means to assure satisfaction if a suit is successful, and to insure a defendant's appearance in an action. *See Aurora*, 85 F.3d at 48 (citing *Swift & Co. v. Compania*

---

[1]  The Supplemental Rules apply to admiralty and maritime claims within the meaning of Federal Rule of Procedure 9(h) with respect to (1) maritime attachment and garnishment; (2) actions in rem; (3) possessory, petitory, and partition actions; and (4) actions for exoneration from or limitation of liability. *See* Supp. R. A; *Continental Shipping Corp. v. Telfair Int'l Corp.*, No. 88 Civ. 7257, 1990 WL 130765, at *1 (S.D.N.Y. Sept. 4, 1990).

*Colombiana Del Caribe*, 339 U.S. 684, 693, 70 S.Ct. 861, 94 L.Ed. 1206 (1950)). Because these purposes are "inextricably linked to a plaintiff's substantive right to recover" and maritime attachment is a characteristic feature of the general maritime law, no state legislation or other law may contravene Rule B or in any way interfere with it. *Aurora*, 85 F.3d at 48.

## IV. DISCUSSION

The key question here is whether a wire transfer intercepted at an intermediary bank is property, because Rule B(1) only allows for "a prayer for process to attach the defendant's *tangible or intangible personal property ....*" Supp. R. B(1) (emphasis added).[2] Rule B itself, however, does not define this phrase. Nor does the Committee Note to Rule B provide any guidance as to whether an electronic fund transfer, as it passes through an intermediary bank, is attachable property.

In answering this question, this Court must apply federal law because the validity of a maritime attachment is governed by federal law. *See Reibor Int'l Ltd. v. Cargo Carriers Ltd.*, 759 F.2d 262, 266 (2d Cir.1985); *Maryland Tuna Corp. v. Nichimen Co.*, 429 F.2d 307, 320 (2d Cir.1970) ("State law is irrelevant to the validity of process under Supplemental Rule B(1)."). Where there is little or no federal precedent on point, however, courts sitting in admiralty look to state law to "fashion[ ] suitable federal common law." *Reibor*, 759 F.2d at 266 (relying on

*Det Bergenske Dampskibsselskab v. Sabre Shipping Corp.*, 341 F.2d 50 (2d Cir.1965)).

### A. No Federal Precedent

There is no federal precedent on point. Although Winter Storm claims that two federal cases stand for the proposition that a wire transfer at an intermediary bank constitutes property, the decisions are inapposite. The first, *United States v. Daccarett*, 6 F.3d 37 (2d Cir.1993), held that a wire transfer is a seizable res as defined by a forfeiture statute. *Id.* at 54. The claimants of seized funds in that case argued that the money was wrongly seized because electronic fund transfers ("EFTs") are mere electronic communications. *See id.* The court applied the plain language of the civil forfeiture statute in issue, which provided for the seizure of "moneys, negotiable instruments, securities, or other things of value [, and] all *proceeds traceable*" to narcotics transactions. *Id.* (citing 21 U.S.C. § 881(a)(6) (emphasis added).[3] *Daccarett* summarized its holding: "Therefore, an EFT while it takes the form of a bank credit at an intermediary bank is clearly a seizable res under the forfeiture statutes." *Id.* at 55.

*Daccarett* did not address the issue of whether an electronic fund transfer, when intercepted at an intermediary bank, constitutes "property." The fact that the government can seize proceeds at any bank as long as there exists some "traceable connection to an illegal transaction in controlled substances," *id.* at 54, sheds little

**2.** Supplemental Rule B(1) was amended in 2000 to incorporate the following stylistic change: Instead of "good, chattel, credit or effect," the Rule now reads "tangible or intangible property." Supp. R. B(1). *See also* Committee Note, Supp. R. B(1) (explaining that the 2000 amendment includes stylistic changes). The Committee Note contains no further explanation for this particular change, and therefore the Court's holding is in no way

based on a more restrictive interpretation of Rule B—as espoused by defendants.

**3.** The court also relied on *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1158 (2d Cir.1986), which interpreted similar provisions of civil forfeiture law to hold that bank credit is "clearly traceable proceeds" and therefore seizable. *See id.*

light on whether an electronic funds transfer is property under maritime law.

The second case Winter Storm cites, *BCCI Holdings,* is unhelpful for a different reason. In that case, the United States had seized all of BCCI's assets in the United States following the bank's collapse due to mismanagement and fraud, and moved to dismiss all third-party claims to BCCI's assets. *See United States v. BCCI Holdings SA,* 980 F.Supp. 21, 23–4 (D.D.C. 1997). One claimant, Khawaja Qadeer Ahmed, argued that he retained title to seized wire transfer funds that he had mistakenly wired to BCCI. *See id.* at 25–26. To determine whether the assets in issue belonged to BCCI or to Ahmed, the court looked to Article 4A of the Uniform Commercial Code ("U.C.C.") for the definition of "acceptance" at a receiving (beneficiary) bank. *See id.* at 27. It concluded that Ahmed retained title to the funds under N.Y. U.C.C. §§ 4–A–209(3), 4–A–207(1), because Ahmed did not have an account at the beneficiary bank, BCCI, which as a consequence could not "accept" Ahmed's misrouted wire transfer. *See id.*

Winter Storm relies on *BCCI Holdings* to argue that TPI retained title to the funds until the beneficiary bank in Scotland "accepted" them, and therefore the funds were TPI's property at the time of attachment at BONY. *See* Pl. Opp. at 10–22. The problem with plaintiff's reliance on *BCCI Holdings* is simple: *BCCI* applies Article 4A of the N.Y. U.C.C. As explained in more detail below, Article 4A also provides that there is no attachable "property" while the wire transfer is in progress.

*See* Official Comment, U.C.C. § 4–A–502. Article 4A states that parties seeking to attach wire transfer funds must do so at the bank of origin or at the destination bank—but not in between. *See* N.Y. U.C.C. § 4–A–503. The Comment explains that the rule prohibiting attachment of a wire transfer midstream was drafted to protect intermediary banks. Official Comment, U.C.C. § 4–A–503.

The leading Second Circuit case on maritime attachment makes clear that whether a funds transfer at an intermediary bank constitutes property remains unanswered by federal courts. *Reibor* involves a CHIPS transfer attached at an intermediary bank in New York. *Reibor,* 759 F.2d at 263–64 (describing CHIPS as "a system for the electronic transfer of funds among member banks through a central computer"). The Second Circuit affirmed the district court's vacatur of the attachment, *see id.* at 266–67, without passing on the "property" issue that the district court had expressly reserved. *See Reibor Int'l, Ltd. v. Cargo Carriers, Ltd.,* No. 83 Civ. 793, 1984 WL 1467, at *2 (S.D.N.Y. July 24, 1984) ("Although there is some dispute as to whether a CHIPS credit passing through collecting banks is attachable property within the meaning of Rule B, we do not reach this question.").[4]

**B. Federal Common Law**

Because "the precedent in federal admiralty law is so thin" and there is "state law more directly on point," I turn now to state law. *Reibor,* 759 F.2d at 263. It is

---

4. On the issue of whether there is federal law on this point, I also note that the Federal Reserve System has adopted Article 4A of the U.C.C. to govern FEDWIRE transactions, including sections 4–A–502 and 4–A–503 which prohibit attachment of wire transfers at intermediary banks. *See* 12 C.F.R. Pt. 210, Subpt. B, App. B (1990)("Article 4A, Funds Trans-

fers"). By its terms, however, Regulation J does not control the transaction at issue in this case, a SWIFTWIRE international transfer. *See id.* § 210.25 (providing "rules to govern fund transfers through Fedwire"); *id.* § 210.25(b)(2)(defining rights and obligations governed by Regulation J).

especially appropriate to look to New York law because "New York is the situs of multiple transactions in world commerce, [making] the New York banking system ... particularly vulnerable to [disruption]." *Id.* at 266 (looking to New York law). *See also Ferrostaal Metals Corp. v. S.S. Lash Pacifico,* 652 F.Supp. 420 (S.D.N.Y.1987)(relying on law of New York to determine validity of maritime garnishment because "New York is the situs of multiple transactions in world commerce ...").[5]

New York law is directly on point. New York has adopted Article 4A of the U.C.C. to govern wire transfers of funds. *See* N.Y. U.C.C. Art. 4A (McKinney 1991). With respect to attaching the funds of a person who initiates a wire transfer (an "originator"), the Article provides that a court may only "restrain" (1) a person from issuing a payment order to initiate a funds transfer; (2) an originator's bank from executing the payment order of the originator; or (3) the beneficiary's bank from releasing the funds to the beneficiary. N.Y. U.C.C. § 4–A–503; *see also* Official Comment, U.C.C. § 4–A–503 (indicating that such restraints may include orders of attachment, among other types of restraints issued on behalf of creditors or other claimants with respect to bank accounts). A creditor cannot reach any other funds because "no property of the originator is being transferred." Official Comment, U.C.C. § 4–A–502. The Comment is more explicit: "This section ... is designed to prevent interruption of a funds transfer after it has been set in motion[;] ... [i]n particular, intermediary banks are protected." Official Comment,

U.C.C. § 4–A–503. *See also Weston Compagnie v. La Republica de Ecuador,* No. 93 Civ. 2698, 1993 WL 267282, at *3–4 (S.D.N.Y. July 14, 1993)(applying N.Y. U.C.C. § 4–A–503 in a non-maritime case to vacate attachment of electronic funds transfer at intermediary bank).

Not only is this rule applied in New York, but Winter Storm concedes that Article 4A of the U.C.C. has been adopted by fifty-two jurisdictions. *See* Pl. Opp. at 12 (citing *The Law of Electronic Fund Transfers,* Vol. 1–1 § 1.05).

## C. Analysis

■ Winter Storm can only attach "tangible or intangible personal property." Supp. R. B(1). From the express provisions of the New York U.C.C., it is apparent that a wire transfer at an intermediary bank is not property. *See* N.Y. U.C.C. §§ 4–A–502, 4–A–503. Because Winter Storm cannot show that the wire transfer that TPI originated at the Bank of Ayudhya was TPI's property when being processed at BONY, the attachment must be vacated. *See, e.g., Union Planters Nat'l Bank v. World Energy Sys. Assoc.,* 816 F.2d 1092 (6th Cir.1987)(affirming a decision to quash a Rule B attachment because funds available under a letter of credit are not property subject to attachment); *Oceanfocus Shipping, Ltd. v. Naviera Humbolt,* 962 F.Supp. 1481 (S.D.Fla.1996)(vacating attachment of secured line of credit because not "a good, chattel, credit or effect" subject to attachment under old Rule B); *Ferrostaal,* 652 F.Supp. at 424 (vacating maritime attachment of open letter of credit because not property).[6]

**5.** The decision to look to New York law does not, of course, change the fact that federal law governs the validity of maritime attachment. *See Reibor,* 759 F.2d at 266, n. 3 ("State law remains irrelevant to the validity of a maritime attachment because it is federal law that determines what attachments are valid."). I look to state law only "as a matter of federal law" to inform the content of federal common law. *Id.*

**6.** Plaintiff argues that vacating this attachment would materially prejudice its rights

There are only two places at which a wire transfer credit is attachable property under Rule B: the bank of origin before a funds transfer is released, and the beneficiary's bank before the funds are released or paid to the beneficiary. *See Weston,* 1993 WL 267282, at *2–4 (applying N.Y. U.C.C. §§ 4–A–502, 4–A–503 in non-maritime case). Not only does this comport with the law of all the jurisdictions, but also makes sense in light of maritime law principles. *See supra* note 6.

When deciding a maritime case, a court must consider "the proper harmony and uniformity of maritime law." *American Dredging,* 510 U.S. at 451, 114 S.Ct. 981 (citing *Southern Pacific Co. v. Jensen,* 244 U.S. 205, 216, 37 S.Ct. 524, 61 L.Ed. 1086(1917)). *See also Aurora,* 85 F.3d at 48 (stressing the importance of "consistent nationwide application of Rule B"). As plaintiff concedes, fifty-two jurisdictions incorporate Article 4A of the U.C.C. and therefore prohibit attachment of wire transfer credits at intermediary banks. Further, the Federal Reserve System has enacted Article 4A of the U.C.C. to govern wire transfers from and to Federal Reserve Banks. *See supra* note 4. Thus, applying the same rule to govern wire transfers in federal maritime law furthers a uniform treatment of wire transfers. Indeed, "[f]reeing garnishees from the burden of keeping track of yet another difference between state attachment law and admiralty attachment law has value in and of itself." *Reibor,* 759 F.2d at 267.

Moreover, it is well established that "[m]erchants engaging in maritime commerce must reasonably expect to be sued where their property may be found." *Leonhardt,* 773 F.2d at 1536 (citing *Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation,* 605 F.2d 648, 655 (2d Cir.1979)). TPI can only foresee suit based on the situs of its property if it knows where its property is—for example, where it maintains a bank account. An originator of a wire transfer does not know what intermediary bank or banks its wire transfer credit may pass through.[7] Permitting wire transfer credits to be attached at unforeseen and unknown intermediary banks runs contrary to the (minimal) due process accorded maritime defendants. *See, e.g., Engineering Equip. Co. v. S.S. Selene,* 446 F.Supp. 706, 710 (S.D.N.Y.1978) (stating that maritime defendant must be reasonably able to foresee being sued in the United States based on the location of its property).

## V. Parties' Arguments

### A. Standing

Winter Storm argues that if the attached funds do not constitute TPI's property, then TPI has no legally cognizable interest and can allege no injury. *See* Pl. Opp. at 4–6. This argument is unavailing. This Court's jurisdiction over defendants is based on the attachment. If the attachment is improper, there is no jurisdiction. A party may always raise an issue as to the court's jurisdiction.

---

under Rule B, *see* Pl. Opp. at 17—22, yet provides no support for the proposition that being able to attach wire transfer credits at an intermediary bank is a substantive right under Rule B. To the contrary, Rule B only permits attachment of tangible or intangible property. Vacating this attachment does not limit plaintiff's federal remedy of attachment in aid of foreign arbitration; it merely defines the limitations of Rule B's definition of the term "property."

7. Although New York is an international hub for currency exchange, this Court declines to endorse a rule stating that every time a foreign maritime entity initiates a wire transfer abroad, it must foresee attachment in New York and suit in the United States.

## B. Preemption

█ The thrust of plaintiff's opposition to defendants' motion to vacate the attachment is that Rule B preempts New York or other state law. *See id.* at 10–22. While federal maritime law certainly preempts any state law that conflicts with it, *see, e.g., Aurora,* 85 F.3d at 48, the argument fails here for two reasons. *First,* there is no federal law that conflicts with state law. *Second,* Winter Storm fails to show that the attachment of wire transfer funds at intermediary banks is a substantive admiralty or maritime right.[8]

Plaintiff cites only to "Rule B," arguing that Rule B does not limit the time when, or class of garnishees on which, a plaintiff may serve a writ of attachment. *See* Pl. Opp. at 13. Certainly, Rule B is simple and direct: it provides that where a defendant cannot be found within the district, a maritime plaintiff may obtain an order of attachment to garnish his property. It has since been interpreted by the courts, however. For example, while Rule B does not prescribe the time within which plaintiff must serve a writ of attachment, courts have established that plaintiff can only validly attach property by serving process at a time after—and not before—the property has come within the possession of the garnishee. *See Reibor,* 759 F.2d at 266–67. Further, this Court does not apply state law but merely borrows from it, as a matter of federal law, to inform the content of federal law. *See id.* at 266 n. 3. Thus, Winter Storm's insistence—that an as-of-yet-uninterpreted Rule B requirement preempts state law—misses the point.

## C. Service of Process

Defendants argue that Winter Storm's service of maritime process was invalid because BONY acted on its knowledge of writs that arrived prior to the electronic payment order. *See* Def. Reply at 9–10. Even if true, *i.e.,* a garnishee bank acts on information contained in ineffective writs of attachment by freezing funds when it receives a wire transfer, that does not contravene *ContiChem* or *Reibor. See ContiChem,* 229 F.3d 426 (vacating attachment on ground that plaintiff sought to end-run Rule B by seeking a temporary restraining order pending attachment proceedings); *Reibor,* 759 F.2d 262 (vacating attachment on specific ground that process was served both before garnishee came into possession of funds and after garnishee released the funds, and no writ was served *while* garnishee was in possession of the funds). The goal of *Reibor* was to relieve the burden on garnishee banks to monitor future transactions. *See Reibor,* 759 F.2d at 267, 268. In any event, this issue need not be decided as the attachment is vacated on other grounds.

## VI. CONCLUSION

Because I conclude that a wire transfer at an intermediary bank is not property subject to attachment under Rule B, defendants' motion to vacate the attachment is granted. Accordingly, this Court lacks jurisdiction over TPI and must dismiss Winter Storm's complaint. The Clerk is directed to close this case.

---

8. Plaintiff cites to an oral ruling by a judge in this district. *See Vrinera Marine Co., Ltd. v. Alexandria National Iron & Steel Co.,* No. 01 Civ. 4536 (Transcript of July 12, 2001), attached as Exhibit 4 to Declaration of Patrick F. Lennon, Plaintiff's Counsel (ruling that attachment of electronic transfer at intermedi-ary bank should not be vacated because Rule B preempts N.Y. U.C.C. §§ 4A–502 and 4A–503). While directly on point, this Court conducted only a cursory analysis of the issue, relying solely on *Daccarett* and *BCCI Holdings. See supra* Part IV.A.