**YAYASAN SABAH DUA SHIPPING SDN BHD, Plaintiff,**

v.

**SCANDINAVIAN LIQUID CARRIERS LIMITED, Defendant.**

**No. 04 CIV. 4368(LAK).**

United States District Court, S.D. New York.

Sept. 13, 2004.

Kirk M. Lyons, Lyons, Skoufalos, Proios & Flood, LLP, New York City, for Plaintiff.

John P. Vayda, Nourse & Bowles, LLP, New York City, for Defendant.

## MEMORANDUM OPINION

KAPLAN, District Judge.

This is an action for breach of a maritime charter party. The matter now is before the Court on defendant's motion to vacate an order of maritime attachment on the grounds that it could be "found in the district" or, alternatively, that the attached funds were held in an off-shore account beyond the territorial reach of the Court.

### I.

Plaintiff Yayasan is a foreign corporation involved in the shipping business. Defendant Scandinavian Liquid Carriers Limited ("SLCL") is a Liberian corporation that charters vessels from others to transport chemical and product cargos for third parties.[1] From time to time, it also "charters out product and chemical tankers to sub-charterers on a time or voyage charter basis. SLCL earns most of its income and profit from the differential between the . . . rate[s] at which it charters vessels [in] and the . . . rate[s] at which it either charters those same vessels [out] . . . or books movement of cargoes."[2] Its managing agent, Copenhagen Tankers A/S, is a Danish entity whose representative, Henrik Madsen, handles SLCL business matters worldwide from Denmark.[3]

Under the charter party at issue, SLCL contracted with Doquest, Inc., the previous owner of the M/V DANUM, to charter the vessel for twelve months beginning in March 2001.[4] Yayasan then purchased the DANUM from Doquest in October 2001, and it claims that it thereby came into privity with SLCL with respect to the charter.[5]

SLCL allegedly served a notice of termination of the charter party shortly after Yayasan purchased the ship.[6] Approximately one year later, Yayasan demanded arbitration of the matter[7] pursuant to a clause in the charter party which designated venue in New York. The parties' respective local counsel thereafter had some discussions and exchanged preliminary correspondence regarding the arbitration, which remains pending.[8] New York counsel for both sides in the arbitration now represent their clients in this action.

Yayasan filed this action in aid of the arbitration[9] on June 9, 2004. In addition to damages, the complaint sought an immediate *ex parte* order of maritime attachment under Rule B(1). Yayasan alleged that SLCL could not be found within the district but had accounts and credits "within the District at various banks."[10] It alleged that it made unsuccessful efforts to locate SLCL in the district before filing suit: it contacted the Secretary of State—which advised that SLCL is not licensed to do business in New York—and consulted various local telephone directories which failed to reveal a listing for SLCL.[11] It did not contact SLCL's New York arbitration counsel—Nourse & Bowles—to ascertain whether that firm was authorized to accept service of process on behalf of SLCL.

1. 7/15/04 Madsen Decl. ¶ 3.

2. *Id.*

3. *Id.*

4. Am. Ans. ¶ 6.

5. Cpt. ¶ 6.

6. Cpt. ¶¶ 7, 8.

7. 7/15/04 Vayda Aff., Ex. 1.

8. *See id.,* Exs. 1–2.

9. Cpt. ¶ 14.

10. *Id.* ¶ 15.

11. 6/8/04 Lyons Decl. ¶¶ 2–4.

The Court granted the order of maritime attachment on June 9, 2004. Yayasan subsequently served a series of restraining notices on the New York branch of the Danske Bank in response to which the bank segregated and froze $500,000 held in an SLCL account.[12]

Yayasan sent notice of the attachment to SLCL's counsel, Nourse & Bowles, on June 14, 2004.[13] Approximately two weeks later, on June 28, 2004, Yayasan's counsel asked Nourse & Bowles if it was authorized to accept service of process on SLCL's behalf.[14] Attorney Vayda of Nourse & Bowles promptly wrote to his client, purportedly to "confirm" that Nourse & Bowles was so authorized. He received a faxed response the following day, June 29, from the Danish Defence Fund—an entity acting on SLCL's behalf—which stated, in relevant part:

"Re: MV Danum.

Dear Jack,

Thank you for your fax of yesterday. Having discussed the matter with Niels Stig Christensen of Copenhagen Tankers, you are hereby authorised to accept service of proceedings in this particular matter only."[15]

Nourse & Bowles subsequently appeared for SLCL in this action and moved to vacate the order of maritime attachment. The parties engaged in limited discovery. The two issues for decision are whether (1) SLCL was "found in the district," within the meaning of Admiralty Rule B, when Yayasan filed suit, and (2) the *situs* of SLCL's Danske Bank account is New York or the Cayman Islands.

## II.

### A. *"Not Found in the District"*

#### 1. *General principles of maritime attachment*

■ Maritime attachment is a centuries-old remedy that "antedates both the congressional grant of admiralty jurisdiction to the federal district courts and the promulgation of the first Supreme Court Admiralty Rules in 1844."[16] Admiralty Rule B, which codifies the law, is "simply an extension of this ancient practice."[17] The device exists for the benefit of merchants engaged in the far flung maritime trade, who face special risks in seeking legal redress "against perpetrators of maritime injury [who] are likely to be peripatetic."[18] Without it, "defendants, their ships, and their funds easily could evade the enforcement of substantive rights of admiralty law."[19]

---

**12.** Yayasan served two successive garnishment notices and related process on the New York branch of the Danske Bank on June 10, 2004. Lyons Aff., Ex. B. On June 11, 2004, Danske Bank segregated and froze SLCL funds in its custody. 7/30/04 Lyons Aff., Ex. H. On June 14, 2004, Yayasan served additional garnishment notices and related process on Danske Bank. 7/30/04 Lyons Aff., Ex. B. On July 29, 2004, Yayasan once again served restraining notices and related process on the Danske Bank. 7/30/04 Lyons Aff., Ex. B.

**13.** SLCL Sur-reply, Ex. 1.

**14.** 7/15/04 Vayda Aff., Ex. 3.

**15.** 7/30/04 Lyons Aff., Ex. I.

**16.** *Aurora Maritime Co. v. Abdullah Mohamed Fahem & Co.*, 85 F.3d 44, 47 (2d Cir.1996); see also *Winter Storm Shipping v. TPI*, 310 F.3d 263, 268 (2d Cir.2002).

**17.** *Aurora Maritime Co.*, 85 F.3d at 47–48.

**18.** *Amoco Overseas Oil. Co. v. Compagnie Nationale Algerienne de Navigation*, 605 F.2d 648, 655 (2d Cir.1979); see also *Ex Parte Louisville Underwriters*, 134 U.S. 488, 493, 10 S.Ct. 587, 33 L.Ed. 991 (1890); 7A MOORE'S FEDERAL PRACTICE § 705.04[1] (Matthew Bender 3d ed.).

**19.** *Aurora Maritime Co.*, 85 F.3d at 48.

■ Rule B allows an admiralty plaintiff to include in the complaint a request for an *ex parte* order of attachment against the defendant's "tangible or intangible personal property—up to the amount sued for—in the hands of garnishees named in the process."[20] A maritime attachment serves the dual purpose of obtaining the appearance of a foreign defendant and ensuring satisfaction of a favorable judgment.[21] Accordingly, a Rule B attachment is available only "[i]f a defendant is not found within the district" where the suit is brought.[22]

### 2. Standard

■ The phrase "not found within the district" is not defined in the Rule. Nevertheless, it denotes two types of absence. First, in order to be subject to maritime attachment the defendant must lack sufficient contacts with the forum to render it subject to personal jurisdiction. Second, the defendant must not be amenable to service of process.[23] A plaintiff must show that the defendant is absent in both senses in order to sustain the attachment. Moreover, a plaintiff must make a *bona fide* effort to locate the defendant in the district before seeking a Rule B attachment,[24] although an "exhaustive search" is not required.[25]

### 3. Was SLCL "found in the district?"

In this case, it is necessary to address only the question whether SLCL was amenable to service of process here at the time Yayasan obtained the order of attachment.

■ Under Fed.R.Civ.P. 4(h), service on a corporation may be made in a judicial district by service upon an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process. SLCL does not contend that it had an officer or a managing or general agent here. Rather, it argues that it could have been served in the district by service upon Nourse & Bowles, its New York arbitration counsel.

As defense counsel essentially conceded at oral argument,[26] Nourse & Bowles was not SLCL's agent for service of process merely because it was serving as its counsel in the arbitration. "By rendering ... legal services, counsel does not become an agent for service of process."[27] Moreover, the record demonstrates that SLCL had not authorized Nourse & Bowles to accept service of process in this action on June 9, 2004. That authority was not conferred until June 29, 2004, in the Danish Defence Club fax.[28] The suggestion that the June 29 fax merely confirmed preexisting authority cannot be reconciled with its clear

---

**20.** SUPP. R. ADM. & MAR. CL. (B)(1)(a).

**21.** *Swift & Company Packers v. Compania Colombiana Del Caribe, S.A.,* 339 U.S. 684, 693, 70 S.Ct. 861, 94 L.Ed. 1206 (1950).

**22.** SUPP. R. ADM. & MAR. CL. B(1)(a)-(b).

**23.** *Seawind Compania, S.A. v. Crescent Line, Inc.,* 320 F.2d 580, 581–82 (2d Cir.1963) (citations omitted).

**24.** *Seawind,* 320 F.2d at 582.

**25.** *Royal Swan Navigation v. Global Containers,* 868 F.Supp. 599, 603 (S.D.N.Y.1994).

**26.** Tr. Or. Arg. 4–5.

**27.** *Integrated Container Serv. v. Starlines Container,* 476 F.Supp. 119, 125 (S.D.N.Y.1979) (rejecting contention, on motion to vacate attachment, that defendants were amenable to service of process through attorneys who were "acting for them in various lawsuits being conducted in the district."); *see also Royal Swan Navigation Co. v. Global Container Lines,* 868 F.Supp. 599, 602 (S.D.N.Y.1994) (rejecting contention that lawyers acting for defendant in district would have accepted service; distinguishing mere physical acceptance of process and authority to do so).

**28.** 7/30/04 Lyons Aff., Ex. I.

language, particularly the phrase "you are *hereby* authorised." [29]

Accordingly, the Court finds that Nourse & Bowles was not authorized to accept service of process on SLCL's behalf until June 29, 2004. Consequently, had Yayasan contacted the firm on June 9 to inquire as to whether it was so authorized, the only accurate answer would have been "no," although counsel, as a matter of courtesy and convenience, doubtless would have sought such authority from its client, as it later did.

■ SLCL nevertheless contends that the failure of plaintiffs' firm to contact Nourse & Bowles to inquire about its authority to accept service before filing suit was a failure to exercise the due diligence required by *Seawind.* The argument is unavailing. The decisions brought to the Court's attention that vacated Rule B attachments for plaintiffs' lack of due diligence uniformly involved circumstances in which there was an agent present in the district who had been expressly authorized to accept service *before* plaintiff sought the attachment and who would have been discovered through diligent efforts.[30] In this case all the diligence in the world, including calling Nourse & Bowles, would not have led to discovery of an SLCL agent for service of process in this district because there was none.

SLCL essentially concedes this point. Instead, it urges the Court to adopt a due diligence standard that would have required Yayasan first to call Nourse & Bowles and then, upon learning that Nourse & Bowles was not authorized to accept service, to wait a "reasonable time" while it conferred with its client as to whether such authority would be granted.[31] The only authority cited by counsel in support of a rule that would require plaintiff's counsel to conduct itself in this way is *Tug Go Getter*,[32] neither the facts nor the holding of which support SLCL's position.[33]

SLCL's proposed rule would undermine maritime attachment. More is at play here than what otherwise might appear to be a lack of professional courtesy among counsel or tactical maneuvering by Yayasan to obtain leverage in the arbitration or this suit. As plaintiff's counsel argued, the "reasonable time" advocated by SLCL readily could afford a window of opportunity to a "peripatetic wrongdoer" quickly to move assets out of the district in order to evade process, liability and judgment.

---

29. *Id.* (emphasis added).

30. *See, e.g., Seawind,* 320 F.2d at 582–83 (attachment vacated where defendant had managing agent in district who would have been found but for plaintiff's failure to make appropriate inquiries); *Dragonfly Shipping Co. v. Canadian Forest Navigation Co.,* No. 89 Civ. 6091, 1989 WL 146273 at *1–2 (S.D.N.Y. Nov. 20, 1989) (KMW) (attachment vacated where plaintiff failed to contact law firm that it knew represented defendant and which was, in fact, authorized to accept service of process.); *State of Oregon v. Tug Go Getter,* 398 F.2d 873, 874–75 (9th Cir.1968) (attachment vacated where defendant had managing agent in district and plaintiff would have found him through diligent efforts as U.S. Marshal easily did).

31. Tr. Or. Arg. 13–14.

32. 398 F.2d 873.

33. *Tug Go Getter,* in line with all other similar authorities, vacated an order of attachment where the defendant in fact had granted authority to a managing agent in the district before plaintiff sought the attachment. Indeed, the marshal who served the process had managed to find him. Plaintiff failed to do so because he did not make diligent efforts before seeking the attachment. 398 F.2d at 874–75. *See also Yu Sheng Fishery Co. v. Dongwon Industries Co.,* No. 91–00018, 1991 WL 126138, at *2 (D.Guam May 20, 1991) (distinguishing *Tug Go Getter* in case where defendants failed to present evidence that an agent in the district had been expressly authorized to accept service.)

Plaintiff's counsel advised the Court, uncontradicted by defense counsel, that this is a common occurrence in the shipping business.[34] SLCL—a Liberian corporation that owns no ships[35] or other assets besides the funds in its Danske Bank account and admits that it earns most of its income from a form of maritime arbitrage[36]—well could have reacted to such a call by transferring the funds out of the Danske Bank account,[37] which it could have done at lightning-speed whether the amount in the bank was one dollar or, as SLCL contends, $1.5 million. Of course this is not to say that SLCL would have done so.[38] But accepting SLCL's position would reflect adoption of a rule that would allow a defendant who otherwise was safely outside the district effectively to avoid Rule B attachment by waiting until after the plaintiff filed a Rule B motion and then getting its assets out of the district.[39] This practice would "eviscerate the time-honored process of maritime attachment."[40]

SLCL's proposed rule would run counter also to what is implicit in the Rule B agency cases—namely, that in order to be "found in the district," a defendant had to be present in the district at the time when the attachment is sought. As SLCL did not have an authorized agent for service of process in the district at the time when Yayasan sought the Rule B attachment, SLCL was "not found in the district" for purposes of Rule B.

## III.

Danske Bank has a branch at 280 Park Avenue in Manhattan. That is where it was served with process pursuant to which it froze $500,000 of SLCL's funds. SLCL nevertheless argues that the attachment must be vacated, even if it was "not found in the district," because its Danske Bank account is in the Cayman Islands, beyond the territorial reach of the Court.

A Rule B attachment reaches only property located within the district in which the suit is brought.[41] As the Court of Appeals has held, "accounts in a foreign branch bank are not subject to attachment or execution by the process of a New York court served in New York on a main office, branch or agency of the bank."[42] New

---

34. Tr. Or. Arg. 23–25.

35. Tr. Or. Arg. 24.

36. Madsen Decl. ¶ 3.

37. According to Mr. Madsen, SLCL's general manager, at the time of the June 2004 attachment SLCL had approximately $1.5 million in the Danske Bank account. Madsen Decl. ¶ 4.

38. As recounted earlier, SLCL contacted its client promptly after Yayasan's inquiry and just as promptly received an express grant of authority to accept process.

39. *Navieros Inter–Americanos, S.A. v. M/V Vasilia Express*, 120 F.3d 304, 315 (1st Cir. 1997).

40. *Id.*

41. *Limonium Maritime v. Mizushima Marinera*, 961 F.Supp. 600, 606 (S.D.N.Y.1997) (*citing Blueye Navigation Inc. v. Oltenia Navigation*, Nos. 94 Civ. 1500 & 94 Civ. 2653, 1995 WL 66654, at *4 (S.D.N.Y. Feb. 17, 1995))(vacating attachment executed through restraining notice served on bank's New York office in order to reach funds in accounts maintained at bank's London office.)

42. *Det Bergenske Dampskibsselskab v. Sabre Shipping*, 341 F.2d 50, 52–53 (2d Cir.1965).

Yayasan's argument that a different result is required under *Digitrex v. J. Howard Johnson*, 491 F.Supp. 66 (S.D.N.Y.1980), is unavailing. *Digitrex* held that service of a restraining notice on Manufacturer's Hanover's main office was sufficient to reach assets in the bank's branch office *within the same jurisdiction*. That holding partially abrogated New York's separate account rule, whereby "each branch of a bank is a separate entity, [and is] in no way concerned with the accounts maintained by depositors in other branches or at a home office." *Cronan v. Schilling*, 100 N.Y.S.2d 474, 476 (Sup.Ct.N.Y.Co.1950). *Digitrex* had followed decisions that limited the separate

York's "separate account" rule similarly restrains the reach of process, maritime or otherwise.[43] SLCL therefore is correct in asserting that the attachment must be vacated if the *situs* of the account is in the Cayman Islands.

In this wired age, the location of an intangible, especially a bank account, is a metaphysical question. By and large, bank deposits exist as electronic impulses embedded in silicone chips. In a sense, therefore, bank funds are both everywhere and nowhere. But the problem is not a new one. Before the advent of electronic banking, courts grappled with the dilemma of pinpointing the location of intangible assets.[44] It is a dilemma that calls for a practical judgment. As Judge Cardozo so eloquently put it in *Severnoe Securities Corporation v. London & Lancashire Inc.*: [45]

> "The situs of intangibles is in truth a legal fiction, but there are times when justice and convenience requires that a legal situs be ascribed to them ... [citations omitted] ... At the root of the selection is generally a common sense appraisal of the requirements of justice and convenience in particular conditions." [46]

In this case, a number of factors favor the Cayman Islands. Mr. Vanderkelen, an officer of Danske Bank, testified that the SLCL account is with Danske Bank's Cayman Islands branch.[47] This is corroborated directly by documentary evidence, including the September 24, 1999, letter from Danske Bank to SLCL (c/o The International Trust Company of Liberia) confirming the opening of a money market account "with the Cayman Islands Branch." [48] In addition, several Danske Bank statements purporting to show monthly activity in SLCL's account are headed "Danske Bank—Cayman Islands Branch—c/o New York Branch." [49] Moreover, Mr. Vanderkelen testified that SLCL's money market account was opened in the Cayman Islands branch so that Danske Bank could pay interest on it, something that is allowed under the law of the Cayman Islands, but not of New York.[50] Finally, there is a suggestion by Mr. Vanderkelen that the Cayman Islands branch is autonomous from the New York office; he stated that the Cayman Islands branch is a "separate branch licensed by the Cayman Islands Monetary Authority." [51]

account rule on the basis of technological advances that created seamless networks between different bank branches. But subsequent courts, including *Limonium*, 961 F.Supp. 600, and *Blueye*, 1995 WL 66654, have held that *Digitrex* cannot be read so broadly as to permit extraterritorial reach of Rule B attachment or garnishment.

**43.** *Fidelity Partners v. Philippine Export and Foreign Loan Guarantee Corp.*, 921 F.Supp. 1113, 1119–20 (S.D.N.Y.1996) (New York "separate account" rule barred attachment and execution against assets held in bank's Manila office by process served on New York branch).

**44.** *See, e.g., Farmers' Loan & Trust Co. v. Minnesota*, 280 U.S. 204, 211, 50 S.Ct. 98, 74 L.Ed. 371 (1930) (negotiable public obligations); *Wyman v. Halstead*, 109 U.S. 654, 656–57, 3 S.Ct. 417, 27 L.Ed. 1068 (1884) (contractual debt); *Douglass v. Phenix Ins. Co.*, 138 N.Y. 209, 220, 33 N.E. 938 (1893) (insurance policy).

**45.** 255 N.Y. 120, 174 N.E. 299 (1931).

**46.** *Id.* at 123–24, 174 N.E. 299.

**47.** 7/28/04 Vanderkelen Dep. Tr. 12.

**48.** 8/3/04 Vanderkelen Aff., Ex. 1.

**49.** 7/15/05 Madsen Decl., Ex. 2.

**50.** 7/3/04 Lyons Aff., Ex. G at 25–26.

**51.** 7/30/04 Lyons Aff., Ex. 8 (Vanderkelen Dep. Tr.)

In contrast, there is powerful evidence that SLCL's account is in New York in any practical sense. In reality, it appears that the Cayman Islands branch is a paper bank entirely controlled and managed by Danske Bank's New York operation.

First, according to Mr. Vanderkelen's uncontradicted testimony, the Caymans branch has no physical existence outside of the New York branch—there is no physical Caymans branch office, there are no Caymans employees, and there are no tangible Danske Bank assets or liabilities in the Caymans.[52]

Second, the Danske Bank's Caymans accounts are entirely "serviced, administered and held exclusively by and through the facilities of [Danske Bank's] New York Branch as correspondent of, manager of, and record-keeper of the Caymans Branch."[53] Mr. Vanderkelen illustrated the point with a discussion of how wire transfers in and out of SLCL's account are executed through a Clearing House Interbank Payments System ("CHIPS") account held by Danske New York. The

Caymans branch does not have a CHIPS account because it legally cannot—no foreign bank can be a part of the CHIPS network. Thus, as "correspondent . . . ., manager . . ., and record-keeper of the Cayman Branch" Danske New York "executes all such transfers via its information systems in New York for the Cayman Branch."[54]

Third, Mr. Vanderkelen testified that the Caymans branch accounts are subject to New York and U.S. legal and regulatory oversight.[55]

Whatever niceties of banking law may permit a new York branch of a foreign bank to create an entirely "paper" or electronic branch in the Cayman Islands and thereby to escape certain U.S. banking regulations, this case calls for application of a pragmatic rule of reason. In all practical respects the Cayman Islands branch was part of the New York branch. The Court therefore finds that the account and funds that SLCL maintained with Danske Bank were in New York at the time of Yayasan's attachment.[56]

---

**52.** 8/3/04 Vanderkelen Aff. ¶ 3.

**53.** *Id.* ¶ 2.

**54.** Mr. Vanderkelen highlighted certain wire transfers that were made specifically in connection with the charter at issue here. Exhibits 1 and 2 to his reply affidavit show SLCL payments for M/V DANUM hire charges where the order was issued by Copenhagen Tankers (on SLCL's behalf) and then executed by Danske New York through its CHIPS account. 8/3/04 Vanderkelen Aff. ¶ 4.

**55.** For example, Vanderkelen stated that assets and liabilities "categorized as those of the Cayman Branch" are "reported in the name of the Cayman Branch in reports prepared by the staff of the New York Branch and filed with the Cayman Islands Monetary Authority." *Id.* ¶ 2. But these assets "may be combined with assets and liabilities of the New

York Branch in filings made with the Federal Reserve System of the United States . . . pursuant to Federal law." *Id.* And assets and liabilities of both the New York and Cayman Branches are reported to the New York Superintendent of Banks. Both the Federal Reserve and the Superintendent have the right to inspect all accounts held in New York including those of the Cayman Branch." *Id.*

**56.** *Cf. Fidelity Partners v. Philippine Export and Foreign Loan Guarantee Corp.,* 921 F.Supp. 1113, 1120 (S.D.N.Y.1996) (for sovereign immunity purposes defendant's bank accounts were located in Manila, rather than New York, branch of Philippine bank—and thus not reachable by service of restraint on New York branch—where evidence showed, *inter alia,* that New York branch "had neither control nor managerial direction over" Manila branch and New York branch maintained no records regarding Manila accounts.)

## IV.

For the foregoing reasons, SLCL's motion to vacate the maritime attachment is denied.

SO ORDERED.