310 F.3d 263
 WINTER STORM SHIPPING, LTD., Plaintiff-Appellant,
v.
TPI, a/k/a Thai Petrochemical Industry Public Company Limited, Thai Petrochemical Limited, Thai Petrochemical Industry PCL, TPI Oil (1997) Co., Ltd. and TPI Oil Co. Ltd., Defendants-Appellees.
 Docket No. 02-7078.
 United States Court of Appeals, Second Circuit.
 Argued June 3, 2002.
 Decided November 6, 2002.
 
 1
 COPYRIGHT MATERIAL OMITTED Patrick F. Lennon, Tisdale & Lennon, LLC, New York, NY, for Plaintiff-Appellant.
 
 
 2
 John J. Sullivan, Hill, Rivkins & Hayden LLP (Richard H. Webber on the brief), New York, NY, for Defendants-Appellees.
 
 
 3
 Before: KEARSE, McLAUGHLIN, Circuit Judges, and HAIGHT, District Judge.*
 
 
 4
 HAIGHT, Senior District Judge.
 
 
 5
 Winter Storm Shipping, Ltd. ("Winter Storm") appeals from the January 11, 2002 Opinion and Order, 198 F.Supp.2d 385, and the January 16, 2002 Judgment of the District Court for the Southern District of New York (Shira A. Scheindlin, District Judge) vacating a maritime attachment of funds of defendants TPI, a/k/a Thai Petrochemical Industry Public Company Limited, Thai Petrochemical Industry PCl, TPI Oil (1997) Co., Ltd. and TPI Oil Co. Ltd. (collectively "TPI") in the hands of garnishee Bank of New York ("BNY") and dismissing Winter Storm's complaint for lack of jurisdiction over TPI. This appeal, involving the interplay between a centuries-old admiralty law procedure and present day banking technology, poses the question whether funds involved in electronic fund transfer ("EFT") between banks are subject to attachment under Rule B(1) of the Supplemental Rules for Certain Admiralty and Maritime Claims. The district court answered in the negative. We vacate the judgment of the district court and remand the case to that court with instructions to reinstate the attachment and retain jurisdiction.
 
 BACKGROUND
 
 6
 Winter Storm, a foreign corporation with a place of business in Malta, chartered its vessel M/V NINEMIA to defendant-appellee TPI, a Thai corporation, to carry an oil cargo from Rabigh, Saudi Arabia, to Rayong, Thailand, in February and March, 2001. Winter Storm claims that TPI breached the charter party by failing to pay the full freight due and owes Winter Storm $361,621.58, an amount that includes interest and anticipated attorneys' and arbitrators' fees. The charter party provides for arbitration of disputes in London.
 
 
 7
 Winter Storm filed a complaint against TPI in the district court on June 21, 2001, and an amended complaint on June 26, 2001 (hereinafter the "complaint"), characterizing its claim as admiralty and maritime in nature under Rule 9(h), Fed.R.Civ. P., and invoking the district court's admiralty jurisdiction conferred by 28 U.S.C. § 1333. The complaint described the charter party of the NINEMIA, the voyage performed, and TPI's failure to pay the full freight, and asserted that "plaintiff has, or will shortly, nominate its arbitrator pursuant to the arbitration clause set forth in the contract of charter." A-10.[1]
 
 
 8
 Winter Storm further alleged that TPI could not be "found within this District" within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure (the "Admiralty Rules") and sought an order directing the Clerk to issue process of maritime attachment and garnishment pursuant to Rule B and the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1, 8 attaching TPI's assets held by garnishees in the amount of $361,621.58.
 
 Admiralty Rule B(1) provides:
 
 9
 (a) If a defendant is not found within the district, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property — up to the amount sued for — in the hands of garnishees named in the process.
 
 
 10
 The process of attachment prayed for by Winter Storm identified "Chase Manhattan Bank and/or Bank of New York" as potential garnishees.
 
 
 11
 Section 8 of the FAA, 9 U.S.C. § 8, which Winter Storm invoked in addition to Admiralty Rule B, makes maritime attachment available to parties to a maritime contract, such as a charter party, which contains an arbitration clause. The statute provides:
 
 
 12
 If the basis of jurisdiction be a cause of action otherwise justiciable in admiralty, then, notwithstanding anything herein to the contrary, the party claiming to be aggrieved may begin his proceeding hereunder by libel and seizure of the vessel or other property of the other party according to the usual course of admiralty proceedings, and the court shall then have jurisdiction to direct the parties to proceed with the arbitration and shall retain jurisdiction to enter its decree upon the award.
 
 
 13
 The district court entered its ex parte order of attachment on June 22, 2002. Process of maritime attachment and garnishment was served upon BNY at 12:19 p.m. and 4:44 p.m. on June 28, 2001, and at 12:50 p.m. and 1:45 p.m. on June 29. At those times BNY did not hold any funds of TPI. However, as a result of these services of process BNY "not later than the close of business on June 28, 2001, placed a stop order on any funds relating to [TPI] passing through" BNY. Affidavit of David Rosenfield ("Rosenfield affidavit"), BNY's Manager — Legal Process and Senior Counsel, A-33.
 
 
 14
 TPI maintained an account with a Thai bank in Bangkok, the Bank of Ayudhya ("BA"), which in turn maintained an account at BNY. TPI entered into an unrelated commercial transaction with Oppsal Shipping Co., Ltd. ("Oppsal"), which maintained an account with the Royal Bank of Scotland in London ("RBS"). TPI's contract with Oppsal called for TPI to pay Oppsal in United States dollars. At 6:48 a.m. on July 2, 2001, BNY received from BA a payment order in respect of an EFT in the amount of $1,085,071.41 on behalf of TPI to the account of Oppsal at RBS. The transfer would be made electronically through BNY in New York City. BA was the originating bank and BNY acted as the intermediary bank.
 
 
 15
 Because BNY, in response to the earlier services of process of attachment procured by Winter Storm, had placed a stop order on TPI funds that might pass through it, BNY did not immediately execute BA's payment order that would have completed the electronic transfer of $1,085,071.41 by BA to RBS. Instead, BNY "placed $361,621.58 from the account of Bank of Ayudhya in a suspense account and issued a payment order in the amount of the balance of $723,449.83 to the account of Oppsal at The Royal Bank of Scotland." Rosenfield affidavit, A-34. The deducted amount of $361,621.58 represents the total amount of Winter Storm's claims against TPI, as recited in the processes of attachment.
 
 
 16
 That sum was still anchored in BNY's suspense account when, at 10:59 a.m. on July 2, 2001, BNY was served with an additional process of maritime attachment on behalf of Winter Storm. BNY continued to hold these funds, now in obedience to the process. Had BNY not taken the earlier action of placing a stop order on any TPI funds that might pass through the bank, then "[i]n the ordinary course of business, The Bank would have executed the payment order well prior to the next service of process, which occurred at 10:59 a.m. on July 2, 2001." Rosenfield affidavit, A-35.
 
 
 17
 In these circumstances, TPI moved in the district court to vacate the attachment of the funds held by BNY in the suspense account. Winter Storm opposed TPI's motion. The district court granted TPI's motion to vacate the attachment and, since the attachment formed the sole basis for jurisdiction quasi in rem over TPI, dismissed Winter Storm's complaint for lack of jurisdiction. Judge Scheindlin held that an EFT intercepted at an intermediary bank is not "property" that can be attached under Admiralty Rule B. She reasoned principally that since the Admiralty Rules do not define "property" in this context, and "[t]here is no federal precedent on point," 198 F.Supp. at 388, recourse should be had to state law. That analysis led the district court to § 4-A-503 of the Uniform Commercial Code as adopted in New York, see N.Y. U.C.C. Art. 4A (McKinney 1991). Section 4-A-503 deals with court injunctions or restraining orders with respect to a "funds transfer," and provides that a court may "restrain" only the originator of a payment order (in this case TPI), the originator's bank (here, BA), or the beneficiary's bank (here, RBS). The section concludes: "A court may not otherwise restrain a person from issuing a payment order, paying or receiving payment of a payment order, or otherwise acting with respect to a funds transfer." The statutory scheme is intended to insulate an intermediary bank in a funds transfer bank from judicial restraint. See Official Comment, U.C.C. § 4-A-503 ("This section ... is designed to prevent interruption of a funds transfer after it has been set in motion[;] ... [i]n particular, intermediary banks are protected.").
 
 
 18
 Regarding U.C.C. § 4-A-503 as controlling, the district court vacated Winter Storm's maritime attachment and dismissed its complaint. This appeal followed.
 
 DISCUSSION
 I. Standard of Review
 
 19
 We review de novo the constructions of the statutes and rules and the conclusions of law upon which the district court based its opinion.
 
 
 20
 II. The History and Characteristics of Maritime Attachment
 
 
 21
 Maritime attachment is centuries old. "The use of the process of attachment in civil causes of maritime jurisdiction by courts of admiralty ... has prevailed during a period extending as far back as the authentic history of those tribunals can be traced." Atkins v. Fibre Disintegrating Co., 85 U.S. (18 Wall.) 272, 303, 21 L.Ed. 841 (1873). As early as 1825, the Supreme Court was able to say of the right of attachment in in personam admiralty cases that "[t]his Court has entertained such suits too often, without hesitation, to permit the right now to be questioned." Manro v. Almeida, 23 U.S. (10 Wheat.) 473, 486, 6 L.Ed. 369 (1825). "[M]aritime attachment is a feature of admiralty jurisprudence that antedates both the congressional grant of admiralty jurisdiction to the federal district courts and the promulgation of the first Supreme Court Admiralty Rules in 1844." Aurora Maritime Co. v. Abdullah Mohamed Fahem & Co., 85 F.3d 44, 47 (2d Cir.1996). Admiralty Rule B, quoted in part supra, contains the current provisions governing maritime attachment.[2] "Rule B is simply an extension of this ancient practice." Aurora, 85 F.3d at 47-48. A Rule B attachment is available only if the defendant "is not found within the district." "As developed by the courts, a defendant will be considered `found within the district' in which the plaintiff brings its action if the defendant has sufficient contacts with the district to meet minimum due process standards and can be served with process in the district." Robert M. Jarvis, An Introduction to Maritime Attachment Practice Under Rule B, 20 Journal of Maritime Law and Commerce, No 4 (October 1989) at 521 (hereinafter "Jarvis").
 
 
 22
 "The rationale underlying maritime attachment is twofold. First, attachment provides a means to assure satisfaction if a suit is successful"; the second purpose is "to insure a defendant's appearance in an action, an aspect of attachment inextricably linked to a plaintiff's substantive right to recover." Aurora, 85 F.3d at 48 (internal citations omitted). See also Manro v. Almeida, 23 U.S. (10 Wheat.) at 489. The jurisdiction conferred by a maritime attachment is characterized as quasi in rem. See Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation, 605 F.2d 648, 654 (2d Cir.1979).
 
 
 23
 Maritime attachment is available whenever "the plaintiff has an in personam claim against the defendant which is cognizable in admiralty.... In other words, the plaintiff's claim must be one which will support a finding of admiralty jurisdiction under 28 U.S.C. § 1333." Jarvis, at 526 & n. 20.
 
 
 24
 The property attached need not have a direct connection to the claim sued upon, since Rule B(1)(a), broadly phrased, allows attachment of "the defendant's tangible or intangible personal property," limited only by "the amount sued for." The case at bar is illustrative; TPI's funds attached by Winter Storm in the hands of BNY were generated by a transaction bearing no relationship to the charter party underlying Winter Storm's claim.
 
 III. Due Process
 
 25
 The district court vacated Winter Storm's attachment principally on the ground that U.C.C. § 4-A-503 precluded EFT funds in the hands of an intermediary bank from being regarded as TPI's "property" within the meaning of Admiralty Rule B. But Judge Scheindlin also said that "[p]ermitting wire transfer credits to be attached at unforeseen and unknown intermediary banks runs contrary to the (minimal) due process accorded maritime defendants." 198 F.Supp.2d at 391. The district court reasoned that a maritime defendant must be reasonably able to foresee being sued in the United States based on the location of its property, citing Schiffahartsgesellschaft Leonhardt & Co. v. A. Bottacchi S.A. de Navegacion, 773 F.2d 1528, 1536 (11th Cir.1985) (which relied in turn upon Amoco, 605 F.2d 648) and Engineering Equipment Co. v. S.S. Selene, 446 F.Supp. 706, 710 (S.D.N.Y.1978), and "decline[d] to endorse a rule stating that every time a foreign maritime entity initiates a wire transfer abroad, it must foresee attachment in New York and suit in the United States." Winter Storm, 198 F.Supp.2d at 391 n. 7. TPI urges this due process theory in resisting Winter Storm's appeal. We address the question first because if Winter Storm's attachment fails to pass constitutional due process muster the district court lacked jurisdiction and no other questions can arise.
 
 
 26
 We begin by noting that in the early days of American admiralty practice, plaintiffs (or "libelants," in the former parlance) simply obtained processes of maritime attachment from the clerk of the district court, without the participation of a judge. See Manro v. Almeida, 23 U.S. (10 Wheat.) 473, 6 L.Ed. 369, vintage 1825, where the Court, upholding the attachment, stated in matter-of-fact fashion that "[t]he clerk, it seems, issued the attachment as process of course," id. at 485.[3] That practice, formerly provided for by Admiralty Rule 2, was continued without substantive change when in 1966, 141 years after the Court decided Manro v. Almeida, the civil and admiralty rules were merged and Admiralty Rule 2 became Supplemental Rule B. See the Advisory Committee Notes to the 1966 adoption ("[Rule B(1)] preserves the traditional maritime remedy of attachment and garnishment, and carries forward the relevant substance of Admiralty Rule 2."). The Advisory Committee Notes go on to say:
 
 
 27
 The former Admiralty Rules did not provide for notice to the defendant in attachment and garnishment proceedings. None is required by the principles of due process, since it is assumed that the garnishee or custodian of the property attached will either notify the defendant or be deprived of the right to plead the judgment as a defense in an action against him by the defendant. Harris v. Balk, 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023 (1905); Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565 (1878). Modern conceptions of fairness, however, dictate that actual notice be given to persons known to claim an interest in the property that is the subject of the action where that is reasonably practicable. In attachment and garnishment proceedings the persons whose interests will be affected by the judgment are identified by the complaint. No substantial burden is imposed on the plaintiff by a simple requirement that he notify the defendant of the action by mail.
 
 
 28
 (emphasis added). In 1966, then, the perception of the rules drafters was that the original maritime attachment rule posed no due process jurisdictional problems, and that the notice-by-mail requirement, new to the rule, satisfied the more generalized "modern conceptions of fairness."
 
 
 29
 That perception underwent something of a sea change "following various non-maritime decisions by the United States Supreme Court which mandated a reconsideration of traditional notions of due process." Jarvis at 523 (citing cases, among them Shaffer v. Heitner, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)).
 
 
 30
 Shaffer, which did not involve a maritime claim, held that quasi in rem jurisdiction must satisfy the same due process requirements set with respect to in personam jurisdiction in International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) and its progeny. See Shaffer, 433 U.S. at 207-12, 97 S.Ct. 2569. In Shaffer, the Delaware courts' assertion of jurisdiction was premised on the sequestration of stock that was conceptually located in Delaware because it was issued by a Delaware corporation; the Supreme Court reversed, noting, inter alia, that the stock was not the subject matter of the litigation and that the underlying cause of action did not relate to the stock. Thus, the constitutional requirement of at least minimal contacts was not met. Id. at 213-17, 97 S.Ct. 2569.
 
 
 31
 In Amoco, 605 F.2d 648, this Court considered the possible effect of Shaffer upon quasi in rem jurisdiction based upon the New York attachment statute, made applicable by Admiralty Rule B. Although the underlying claim for breach of charter party was maritime in nature, the validity of the attachment turned solely upon New York law, for reasons explained in Amoco, 605 F.2d at 650:
 
 
 32
 The attachment was effected under state law, N.Y.C.P.L.R. §§ 6201 et seq., pursuant to Fed.R.Civ.P. Supplemental Rule B (for certain admiralty and maritime claims). By inadvertence, appellees did not also utilize the federal procedure which may be employed "in addition" under Rule B(1). Accordingly, it was incumbent upon them to perfect their state quasi in rem jurisdictional base by complying with New York statutory requirements. § 6214.
 
 
 33
 The Amoco court held that plaintiff had complied with the New York attachment statute. 605 F.2d at 652-54. The court then had to deal with defendant's "challenge to the jurisdiction of the court below," based upon "the due process clause as it restricts the assertion of personal jurisdiction through proceedings by attachment." Id. at 654. Defendant argued that plaintiff's attachment was invalid under the ruling in Shaffer, whose effect the Amoco court described:
 
 
 34
 Shaffer completed the process of supplanting the old doctrine of personal jurisdiction based upon state sovereignty with a newer theory of personal jurisdiction stemming from notions of due process. Under the regime of Shaffer, the test of "`fair play and substantial justice'" that governs in personam jurisdiction controls in rem jurisdiction as well. But this extension of the "fair play" test to the ostensible exercise of jurisdiction over property is not necessarily incompatible with the principle of jurisdiction quasi in rem because the presence of property in a State may bear on the existence of jurisdiction by providing contacts among the forum State, the defendant, and the litigation. The real teaching of Shaffer is that courts must look at realities and not be led astray by fictions.
 
 
 35
 Id. at 654-55 (citations and internal quotation marks omitted). Analyzing Shaffer from that standpoint, and upholding the validity of the attachment in Amoco, the Amoco court discerned "several distinguishing [factors] .... First, and most notable, is the fact that here, unlike Shaffer, the property attached is related to the matter in controversy. Far from being present in New York adventitiously, the freights that were attached were in [garnishee] Poten's accounts in New York pursuant to the Charter Party." Id. at 655 (citations omitted). Amoco also noted that "the parties to the Charter also specified that arbitration was to take place in New York," an agreement which "carries considerable weight in demonstrating that it is not unfair to require the parties to litigate in the forum in which arbitration was designated to take place." Id.
 
 
 36
 Although the Amoco court had said that the validity of the attachment turned solely upon the New York statute,[4] the court went on to discuss Shaffer in the contexts of admiralty jurisdiction and maritime attachment:
 
 
 37
 ... Shaffer did not consider assertion of jurisdiction over property in the admiralty context. Because the perpetrators of maritime injury are likely to be peripatetic, and since the constitutional power of the federal courts is separately derived in admiralty, U.S. Constitution Art. III § 2, suits under admiralty jurisdiction involve separate policies to some extent. This tradition suggests not only that jurisdiction by attachment of property should be accorded special deference in the admiralty context, but also that maritime actors must reasonably expect to be sued where their property may be found.
 
 
 38
 605 F.2d at 655 (citation omitted). While the Amoco court found it unnecessary to decide whether, as "[a]t least one district court in another jurisdiction has held," Shaffer "does not affect jurisdiction obtained under Admiralty Rule B attachment," it went on to say that "even if the Shaffer rule of `minimum contacts'/`fair play' applies in the realm of jurisdiction by attachment in admiralty, that application must be understood in the light of the special history and circumstances of that unique body of law." Id. at 655 n. 7 (citations omitted).
 
 
 39
 Given its procedural circumstances, Amoco cannot be regarded as a square holding, one way or the other, on the applicability of Shaffer-style due process requirements to maritime attachments. Such indications as may be gleaned from the opinion seem to point in the direction of subjecting admiralty attachments to less stringent requirements.
 
 
 40
 A number of district and circuit courts were required to confront head-on the possible effect of Shaffer and comparable non-maritime cases decided by the Supreme Court in the 1970s upon maritime attachment under Admiralty Rule B as it existed subsequent to the 1966 merger with the civil rules. Various maritime defendants contended that "Rule B was unconstitutional because it 1) permitted plaintiffs to proceed in an ex parte fashion; and, 2) authorized the clerk of the court to grant the plaintiff's attachment request." Jarvis at 523. These constitutional challenges had only limited success. In his 1989 article Professor Jarvis was in a position to say: "Although some of these challenges succeeded at the district court level, every appellate court which had the opportunity to review the constitutionality of Rule B concluded that it was valid," citing as examples Leonhardt, 773 F.2d 1528, Trans-Asiatic Oil, Ltd. S.A. v. Apex Oil Co., 743 F.2d 956 (1st Cir.1984), and Polar Shipping Ltd. v. Oriental Shipping Corp., 680 F.2d 627 (9th Cir.1982).
 
 
 41
 Notwithstanding the unanimity of the post-Shaffer appellate decisions upholding the constitutionality of Admiralty Rule B, the drafters of the rules amended Rule B(1) in 1985 in order to address any possible due process concerns. While the practice of granting maritime attachments on an ex parte basis remains, Rule B(1) now requires the plaintiff to appear before a judge to procure an attachment. See Rule B(1)(b) ("The court must review the complaint and affidavit and, if the conditions of this Rule B appear to exist, enter an order so stating and authorizing process of attachment and garnishment.").[5] The Advisory Committee Notes to the 1985 amendments explain their purpose:
 
 
 42
 Rule B(1) has been amended to provide for judicial scrutiny before the issuance of any attachment or garnishment process. Its purpose is to eliminate doubts as to whether the Rule is consistent with the principles of procedural due process enunciated by the Supreme Court (citing cases). Such doubts were raised in Grand Bahama Petroleum Co. v. Canadian Transportation Agencies, Ltd., 450 F.Supp. 447 (W.D.Wash.1978); and Schiffahartsgesellschaft Leonhardt & Co. v. A. Bottacchi S.A. De Navegacion, 552 F.Supp. 771 (S.D.Ga.1982), which was reversed, 732 F.2d 1543 (11th Cir. 1984). But compare Polar Shipping Ltd. v. Oriental Shipping Corp., 680 F.2d 627 (9th Cir.1982), in which a majority of the panel upheld the constitutionality of Rule B because of the unique commercial context in which it is invoked....
 
 
 43
 The 1985 amendments to the Admiralty Rules also included an addition to Rule E, which contains general provisions for practice in actions in rem and quasi in rem. New Rule E(4)(f) provides: "Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules."[6] The Advisory Committee notes explain that "Rule E(4)(f) is designed to satisfy the constitutional requirement of due process by guaranteeing to the shipowner a prompt post-seizure hearing at which he can attack the complaint, the arrest, the security demanded, or any other alleged deficiency in the proceedings."
 
 
 44
 It does not appear that any court subsequent to the 1985 amendments has questioned the constitutionality of maritime attachment under Rule B, let alone holding the Rule and the admiralty practice under it constitutionally infirm on due process grounds. In this Circuit Aurora, 85 F.3d 44, and ContiChem LPG v. Parsons Shipping Co., Ltd., 229 F.3d 426 (2d Cir.2000), dealt with Rule B(1) maritime attachments after the 1985 amendments became effective on August 1 of that year. Neither decision evidences any due process concern, and the ContiChem court observed with seeming equanimity:
 
 
 45
 Although a plaintiff seeking attachment must supply, along with its verified complaint, an affidavit stating that defendant cannot be found within the district, little else is required and there need only be a hearing after the attachment is served. See Rule B(1).
 
 
 46
 229 F.3d at 434. This Court also expressed no due process concerns in Reibor International Ltd. v. Cargo Carriers (KACZ-CO.) Ltd., 759 F.2d 262 (2d Cir. 1985), where the maritime attachment was procured under the original Admiralty Rule B; Reibor was decided in April 1985, four months before the 1985 amendments to Rules B and E became effective.
 
 
 47
 Due process concerns having been expressed in the case before us, they must be assessed in the light of the 1985 amendments to Admiralty Rules B and E. The district court did not refer to those amendments, and the cases the court cited antedate them. Under the rules as presently worded, process of maritime attachment cannot issue (absent exigent circumstances) unless a judge authorizes the process, and a defendant property owner is entitled to prompt notice of the attachment and a court hearing to test its validity. These amendments were fashioned for the stated purpose of addressing due process concerns. No court has subsequently suggested that the amendments were inadequate to that task.
 
 
 48
 The practical effect of the district court's analysis is that, in addition to the due process safeguards the 1985 amendments extended to defendants, funds in an EFT can never be subjected to maritime attachment unless the defendant also had specific advance knowledge of the name and address of the intermediary bank. We do not agree that so significant a restriction should be placed upon the traditional admiralty practice of maritime attachment. The use of EFTs, product of the modern electronic age, is widespread in international trade. Banking networks serving global commerce tend to use intermediary banks in the world's financial capitals such as New York, a wholly foreseeable arrangement that this Court noted in Reibor, 759 F.2d at 266: "Often, when a person in one foreign country makes a payment in U.S. dollars to someone in another foreign country, the payment clears through New York."
 
 
 49
 Indeed, the commercial and financial facts in Reibor closely resemble those in this case. The Spanish shipper of the cargo the chartered vessel carried to Jordan instructed its Madrid bank to transfer funds to the Canadian charterer's bank in Canada. "These funds passed through New York branch banks to effect the exchange into dollars." 759 F.2d at 264. The shipowner, claiming a breach of charter, served process of maritime attachment on the New York banks, taking the position that the funds in the EFT were property of the charterer and attachable under Admiralty Rule B. The attachments failed because at the time they were served the funds had not yet been transferred to the New York intermediary banks. We discuss Reibor in other contexts supra, but note for present purposes that Reibor voices no due process concerns in a case where the relevant circumstances are indistinguishable from the present case.
 
 
 50
 We regard the due process safeguards added by the 1985 amendments to Admiralty Rules B and E as sufficient to satisfy constitutional requirements, and discern in the due process clause no basis for rendering the traditional remedy of maritime attachment inapplicable to electronic transfers of funds familiar to those engaged in international trade and increasingly used by them. Accordingly we hold that when an individual or company transfers funds by means of an EFT, those funds may be subjected to maritime attachment in the hands of an intermediary bank without violating constitutional due process, whether or not the initiator of the transfer knew which intermediary bank would be used to effect it.
 
 
 51
 It is true that unlike Amoco, the funds of TPI attached in the hands of BNY bore no relationship to the underlying charter party, but maritime attachment has never required such a relationship. In Manro v. Almeida, 23 U.S. (10 Wheat.) 473, 6 L.Ed. 369, the property attached had nothing to do with the out-of-district defendant's maritime tort. More recently, ContiChem, 229 F.3d at 429, and Aurora, 85 F.3d at 46, involved the maritime attachment of defendants' bank accounts which, as in the present case, bore no relationship to the underlying claim.
 
 
 52
 It follows that if TPI's funds involved in the EFT constituted "property" of TPI within the meaning of Admiralty Rule B(1), those funds are subject to a valid maritime attachment, unless U.C.C. § 4-A-503 requires a different result. To those questions we now turn.
 
 
 53
 IV. EFT Funds as "Property" for Purposes of Maritime Attachment
 
 
 54
 In determining whether TPI's funds in the hands of BNY during the implementation of an EFT constituted "property" of TPI for purposes of Admiralty Rule B(1), we confront a question this Circuit left undecided in Reibor, 759 F.2d 262.
 
 
 55
 Plaintiff Reibor chartered its vessel to defendant Cargo, a Canadian company that could not be found within the Southern District of New York. Alleging breaches of charter by Cargo, Reibor served Admiralty Rule B writs of attachment on the New York branches of Manufacturers Hanover Trust Co. ("MHT/NY") and the Royal Bank of Canada ("RBC/NY"). Reibor was attempting to attach funds to be remitted to Cargo under a letter of credit calling for the transfer of funds from the Madrid branch of Manufacturers Hanover ("MHT/Madrid") to the Royal Bank of Canada at Montreal ("RBC/Montreal").
 
 
 56
 Reibor served two Rule B processes on MHT/NY, one on January 28 and the other on February 8, 1983. But it was not until February 11 that MHT/Madrid instructed MHT/NY to make an interbank transfer to RBC/NY through the Clearing House Interbank Payments System ("CHIPS"), a system for the electronic transfer of funds among member banks through a central computer. Reibor also served a process on RBC/NY at 10:25 a.m. on February 11, but RBC/NY did not receive the CHIPS credit until 2:21 p.m. on that day. A fourth process, served on February 14 or 15, "came too late: RBC/NY had wired the money to RBC/Montreal at 3:22 p.m. on February 11." 759 F.2d at 264.
 
 
 57
 In these circumstances, this Court identified the question on appeal as "the validity of a maritime garnishment served before the garnishee comes into possession of the property to be garnished." 759 F.2d at 263. In other words, the issue was whether a Rule B attachment covers "after-acquired property," that is, property of a defendant coming into the possession of a garnishee after service of process upon the garnishee.
 
 
 58
 The Reibor court concluded that on the question of after-acquired property, "the precedent in federal admiralty law is so thin that we should turn to state law more directly on point." 759 F.2d at 266. The court found that law in N.Y. C.P.L.R. § 6214(b), as explicated in McLaughlin's Practice Commentary: where the order of attachment is left with a third-party garnishee, "the levy is absolutely void unless the garnishee has some property belonging to the defendant or owes the defendant a debt at the time the order is left with him." N.Y. C.P.L.R. § 7B (McKinney 1980). Applying that state law principle to Reibor's Admiralty Rule B attachments, and given the chronology summarized above, this Court concluded that Reibor's processes were absolutely void.[7]
 
 
 59
 As an alternative basis for vacating the attachments, both MHT/NY and RBC/NY argued that "a CHIPS credit is not property subject to attachment under the Admiralty Rules." Reibor, 759 F.2d at 264. This Court did not reach that question in Reibor, preferring to reserve it for "another day when somebody has served a writ of attachment on a bank either after it has received instructions from its forwarding bank to transfer a CHIPS credit but before it has made the transfer, or after it has received a CHIPS credit but before it has transferred any funds related thereto." Id. at 268-269. With the present case, that day has dawned.
 
 
 60
 As Reibor indicates, while "Federal law generally governs questions as to the validity of Rule B attachments," 759 F.2d at 265, state law may be borrowed if there is no federal admiralty law in point on the particular question presented. In support of this practice the Reibor court cited Det Bergenske Dampskibsselskab v. Sabre Shipping Corp., 341 F.2d 50 (2d Cir.1965), an earlier example in this Circuit of looking to state law for guidance with respect to the effect of a maritime attachment. In Reibor the particular question presented was whether a writ of maritime attachment covered after-acquired property. In Bergenske the question was whether a writ of maritime attachment served on a branch office located in the Eastern District of New York was effective to attach a bank account at a branch office of the same bank located in the Southern District. The Bergenske court, while declaring that "[t]his argument must be dealt with according to federal law," also observed that "there is no established admiralty doctrine on this question, such as would reflect a predominant federal interest," and accordingly turned to state cases holding that "accounts in a foreign branch bank are not subject to attachment or execution by the process of a New York court served in New York on a main office, branch, or agency of the bank." 341 F.2d at 52-53 (citations omitted).
 
 
 61
 Reibor and Bergenske demonstrate that in order to decide whether TPI's funds involved in the EFT constituted TPI's property under Admiralty Rule B, we must first determine whether governing federal law provides the answer, in general terms or otherwise; or whether federal law is silent on the particular question presented, so that recourse may appropriately be had to state law. In Judge Scheindlin's view, "[t]he leading Second Circuit case on maritime attachment makes clear that whether a funds transfer at an intermediary bank constitutes property remains unanswered by federal courts," 198 F.Supp.2d at 389, citing Reibor. This overstates Reibor, where this Court deliberately refrained from saying anything about that question, rather than explicitly declaring, as did Bergenske, that there was no pertinent admiralty law with respect to the particular question upon which that case turned.[8]
 
 
 62
 Initially examining admiralty law, as we must, we encounter Rule B(1) itself, which provides that a maritime plaintiff may "attach the defendant's tangible or intangible personal property." It is difficult to imagine words more broadly inclusive than "tangible or intangible." What manner of thing can be neither tangible nor intangible and yet still be "property?" The phrase is the secular equivalent of the creed's reference to the maker "of all there is, seen and unseen."[9] Professor Jarvis has said that
 
 
 63
 Rule B also permits a plaintiff to attach intangible items, such as debts owed to the defendant. Such items may be attached even if they have not yet matured or have only partially matured. Of course, the defendant's entitlement to the credit or interest in the debt must be clear.
 
 Jarvis, at 530 (footnotes omitted).[10]
 
 64
 There is no question that federal admiralty law regards a defendant's bank account as property subject to maritime attachment under Rule B. See, e.g., Aurora, 85 F.3d at 46 ("On January 26, 1994, Aurora served [the Hong Kong and Shanghai Banking Corporation Limited] ["HSBC"] with supplemental process of maritime attachment and garnishment under Rule B and attached Fahem's account with HSBC."). Nor are we able to discern in admiralty law or elsewhere a basis for regarding TPI's funds in BNY's hands prior to their electronic transfer to RBS as anything other than funds held by BNY for the account of TPI.
 
 
 65
 This Circuit has not previously considered in an admiralty case the susceptibility of funds involved in an EFT to attachment under Admiralty Rule B. Unlike the district court, however, we find significant guidance in United States v. Daccarett, 6 F.3d 37 (2d Cir.1993), which involved a civil forfeiture action under federal drug laws. Daccarett holds that "an EFT while it takes the form of a bank credit at an intermediary bank is clearly a seizable res under the forfeiture statutes." Id. at 55. The case is instructive in the admiralty field because the attachments of funds in Daccarett were accomplished pursuant to the Admiralty Rules, incorporated by reference into the forfeiture statute.
 
 
 66
 The facts in Daccarett are as follows. In June 1990 Luxembourg police arrested three associates of the Cali, Colombia drug cartel who had deposited large sums for the cartel in hundreds of European banks. Correctly anticipating that the arrests would trigger efforts by the cartel to move these funds to Colombia before they could be confiscated elsewhere, the Luxembourg authorities requested the assistance of several countries, including the United States, in freezing monies related to the cartel. "During July and August 1990, a flurry of electronic funds transfers from the suspect accounts ensued, resulting in the seizure of... $12 million in the United States" which was
 
 
 67
 the aggregate of dozens of EFTs sent through New York City intermediary banks that had correspondent banking relationships with Panamanian and Colombian banks.... After receiving the subject EFTs, the intermediary banks were supposed to credit the accounts of designated correspondent Colombian banks; the Colombian banks were then supposed to notify the beneficiaries that the funds were available.
 
 
 68
 6 F.3d at 44.
 
 
 69
 The United States government interdicted the funds by serving a number of Admiralty Rule C warrants in rem upon the New York intermediary banks. The Colombian beneficiaries (collectively "the claimants") appeared in the district court to contest the seizures and claim the funds.
 
 
 70
 The seizures were made pursuant to 21 U.S.C. § 881(a)(6), which provides for the forfeiture of "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance [as well as] all proceeds traceable to such an exchange" (emphasis added), the government proceeding under the italicized phrase. Section 881(b), as it then read, provided that the government could institute civil forfeiture in rem proceedings by following the process set forth in the Admiralty Rules, particularly Rule C, which authorizes the arrest of a vessel or other property to enforce a maritime lien against it.[11]
 
 
 71
 That portion of the Daccarett opinion pertinent to the present appeal was prompted by certain contentions of the claimants:
 
 
 72
 Claimants argue that EFTs are not seizable properties for purposes of the civil forfeiture statutes because they are merely electronic communications. They claim that an EFT is not a direct transfer of funds, but rather a series of contractual obligations to pay. Furthermore, they define an EFT as "an intangible property, which not only cannot be stopped once transmitted, but the Intermediary Bank upon accepting it cannot alter from the instructions contained therein." Finally, they claim that only after a transmission is complete and the communication is accepted and received by the beneficiary does it become a seizable res.
 
 
 73
 6 F.3d at 54. This is in effect the argument the intermediary banks made in Reibor in an effort to insulate EFTs from maritime attachment under Admiralty Rule B. While the Reibor court declined to decide whether EFTs were subject to attachment under Admiralty B, the Daccarett court squarely held that EFTs are subject to arrest under Admiralty Rule C:
 
 
 74
 The claimants' conception of the intermediary banks as messengers who never hold the goods, but only pass the word along, is inaccurate. On receipt of EFTs from the originating banks, the intermediary banks possess the funds, in the form of bank credits, for some period of time before transferring them on to the destination banks. While claimants would have us believe that modern technology moved the funds from the originating bank through the intermediary bank to their ultimate destination without stopping, that was not the case. With each EFT at least two separate transactions occurred: first, funds moved from the originating bank to the intermediary bank; then the intermediary bank was to transfer the funds to the destination bank, a correspondent bank in Colombia. While the two transactions can occur almost instantaneously, sometimes they are separated by several days. Each of the amounts at issue was seized at the intermediary bank after the first transaction had concluded and before the second had begun.
 
 
 75
 6 F.3d at 54. That is precisely what happened in the instant case. The processes of attachment Winter Storm seeks to enforce were served upon BNY after funds had moved from BA, the originating bank, to BNY as intermediary bank, but before BNY transferred the funds to RBS, the destination bank.
 
 
 76
 The Daccarett court's analysis of an EFT led to its conclusion that "an EFT while it takes the form of a bank credit at an intermediary bank is clearly a seizable res under the forfeiture statutes." 6 F.3d at 55. There is no principled basis for applying a different analysis or arriving at a different conclusion in the instant case. It is of no moment that Daccarett was a drug case and this is an admiralty case, or that the civil forfeiture statute and the Admiralty Rules differ in their descriptions of the circumstances justifying process against property, or that in Daccarett the government used Admiralty Rule C to arrest the funds while Winter Storm used Rule B to attach them. These are distinctions without a difference because they do not bear upon the decisive question presented, namely, whether EFT funds in the hands of an intermediary bank are subject to interdiction by legal process. Daccarett's holding that such funds are subject to Admiralty Rule C arrest furnishes authority for the conclusion that they are equally subject to Admiralty Rule B attachment. We reach that conclusion in this case.
 
 
 77
 It follows that the broad, inclusive language of Admiralty Rule B(1)(a) and the EFT analysis in Daccarett combine to fashion a rule in this Circuit that EFT funds in the hands of an intermediary bank may be attached pursuant to Admiralty Rule B(1)(a). Because that rule is derived from federal law, there is no occasion to look for guidance in state law. However, the district court looked to state law as embodied in U.C.C. § 4-A-503 and held it was fatal to Winter Storm's attachment. Even if, contrary to the conclusion we have just expressed, it was appropriate to consider state law, this provision of the U.C.C. cannot abrogate Winter Storm's right to a maritime attachment.
 
 V. U.C.C. § 4-A-503
 
 78
 U.C.C. § 4-A-503 prohibits courts from restraining EFT funds in the hands of an intermediary bank. The Official Comment to the section clearly states its purpose: "In particular, intermediary banks are protected." The section's effect in this case, as evidenced by the district court's conclusion, is to deprive Winter Storm of the ability to serve process of maritime attachment upon TPI's funds in the hands of BNY. That is an impermissible effect because Admiralty Rule B preempts U.C.C. § 4-A-503.
 
 
 79
 In American Dredging Co. v. Miller, 510 U.S. 443, 446-447, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994), the Supreme Court reiterated that while it is "the consequence of exclusive federal jurisdiction that state courts may not provide a remedy in rem for any cause of action within the admiralty jurisdiction," in exercising in personam jurisdiction "a state may adopt such remedies, and ... attach to them such incidents, as it sees fit so long as it does not attempt to make changes in the substantive maritime law"; that latter proviso "is violated when the state remedy works material prejudice to the characteristic features of the general maritime law or interferes with the proper harmony and uniformity of that law in its international and interstate relations." Id. (citations and internal quotation marks omitted) (emphasis added). These prohibited effects are stated in the disjunctive; either results in maritime law preemption of a state remedy.
 
 
 80
 That principle of preemption applies to state statutes enacted for the protection of banks, as this Circuit held in Aurora, 85 F.3d 44, a decision which is dispositive of this aspect of the instant case. In Aurora the plaintiff obtained an Admiralty Rule B maritime attachment of the defendant's account in a New York bank. The bank moved for an order vacating plaintiff's attachment so that the bank could exercise a right of set-off against the account created by New York Debtor and Creditor Law § 151 in favor of the bank. This Court held that the garnishee bank's set-off right conflicted with the plaintiff's Admiralty Rule B right of attachment, since if the set-off were enforced in the bank's favor there would be a smaller amount of funds subject to maritime attachment. The opinion in Aurora notes that "[m]aritime attachment is by any test a characteristic feature of the general maritime law," it being "self-evident that the maritime attachment is not merely well established in admiralty, but that it is a unique, characteristic feature of that branch of our law." Id. at 47-48 (citations and internal quotation marks omitted). Accordingly, the Aurora court held that in view of American Dredging's limitations upon state laws, Admiralty Rule B preempted § 151 of the New York Debtor and Creditor Law: "By permitting a bank to set off amounts owed to it against a defendant's account notwithstanding an earlier maritime attachment, therefore, Section 151 threatens to undermine the power of federal admiralty courts sitting in New York to enforce substantive admiralty law." Id. at 48.[12]
 
 
 81
 U.C.C. § 4-A-503, another state statute enacted for the protection of banks, has the effect of eliminating Winter Storm's right of maritime attachment, rather than simply limiting it, as did the preempted state statute in Aurora. The rationale of Aurora squarely applies to this case, so that even if a general recourse to state law were appropriate, the particular statute upon which the district court grounded its decision is preempted by the general maritime law.
 
 CONCLUSION
 
 82
 For the foregoing reasons, we vacate the judgment of the district court and remand the case to that court with instructions to reinstate the maritime attachment obtained by Winter Storm and to retain jurisdiction in the case in accordance with the principles and practices of federal admiralty law.
 
 
 
 Notes:
 
 
 *
 The Honorable Charles S. Haight, Jr., of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 The district court's opinion states that "[b]oth parties have now appointed arbitrators, and the arbitration is proceeding." 198 F.Supp.2d at 386
 
 
 [2]
 Initially the Admiralty Rules were a separate body of rules of practice promulgated by the Supreme Court. On July 1, 1966 the Federal Rules of Civil Procedure and the Admiralty Rules were merged. There are now six lettered "Supplemental Rules" for admiralty and maritime claims which deal with particular aspects of admiralty practice
 
 
 [3]
 The statement of the case preceding the opinion inManro v. Almeida observed that "[i]t appeared by the admission of counsel at the hearing, that the attachment had been issued by the Clerk of the District Court, as a process of course, without any particular order of the Judge." 23 U.S. (10 Wheat.) at 474.
 
 
 [4]
 The district court had taken a different view, holding (as paraphrased by this Court) that "the jurisdiction quasi in rem was governed by traditional admiralty principles and was not, in any event, within the scope of the Supreme Court's recent decision inShaffer v. Heitner, concerning due process limitations on quasi in rem jurisdiction." 605 F.2d at 651-52 (internal citations omitted). The district court did not discuss plaintiff's inadvertent failure to invoke the substantive provisions of Admiralty Rule B, the omission which, as we have noted in text, led this Court to identify the New York attachment statute as the governing law.
 
 
 [5]
 Rule B(1)(c) provides that "[i]f ... exigent circumstances make court review impracticable, the clerk must issue the summons and process of attachment and garnishment."
 
 
 [6]
 The quoted provision of Rule E(4)(f) does not apply to certain suits for seamen's wages or to "actions by the United States for violation of any statute of the United States." Rule E(4)(f), last sentence
 
 
 [7]
 TPI attempts to bring the present case within this holding inReibor by stressing that when Winter Storm served its first processes of attachment on BNY, the bank did not hold any funds of TPI. Had the BNY bank officer recently read the Reibor opinion, he might very well have regarded those first processes as absolutely void, and not placed a "stop order" on any after-acquired TPI funds. In point of fact, however, BNY did place the stop order, perhaps pursuant to some agreement between the bank and its depositors not revealed by the record; and so TPI funds were in the bank's possession when Winter Storm's later processes of attachment were served, thereby satisfying the Reibor requirement. TPI may feel aggrieved by BNY's conduct, a question about which we intimate no view, but Winter Storm's actions are entirely blameless; in serving a series of processes its counsel did no more than careful practitioners would do. Professor Jarvis, in his discussion of Reibor, observes that "[s]ince the plaintiff normally will not know when the funds will reach the bank, and since the bank may have instructions from the defendant to move the funds to another bank as soon as they arrive, the plaintiff in such a case has no choice but to have process served on the bank in a continuous manner." Jarvis at 536 (footnote omitted). Accordingly this case bears no meaningful resemblance to ContiChem, 229 F.3d 426, upon which TPI places an unjustified reliance. In ContiChem defendants' funds were in the garnishee bank's possession at the time process of attachment was served only as the result of a tactical course of conduct on plaintiff's part which the court regarded as improper. See 229 F.3d at 434 ("We hold that ContiChem improperly attempted to circumvent the rule against attachment of property not yet in Unibank's possession" in several different ways). We need not recount the various improprieties in which the ContiChem plaintiff indulged; it is sufficient for present purposes to say that Winter Storm did nothing questionable.
 
 
 [8]
 The district court exhibited the same reticence inReibor, stating with respect to "whether a CHIPS credit passing though collecting banks is attachable property within the meaning or Rule B" that "we do not reach this question." No. 83 Civ. 793, 1984 WL 1467, at *2 (S.D.N.Y. July 24, 1984).
 
 
 [9]
 The quotation is from the Nicene Creed, which may be traced to the Council of Nicea in A.D. 325
 
 
 [10]
 Rule B(1)(a)'s reference to "the defendant's tangible or intangible personal property" was contained in amendments to the Admiralty Rules in 2000; previously Rule B(1) had referred to "the defendant's goods and chattels, or credits and effects in the hands of garnishees to be named in the process ..." The Advisory Committee Notes characterize the amendment as one of "style changes." The district court perceived no substantive difference between the two versions, 198 F.Supp.2d at 388 n. 2, and neither do we. It is striking, however, that Professor Jarvis's 1989 analysis of Rule B's extension to the "intangible property" of a defendant foretells the 2000 amendments' use of that very phrase
 
 
 [11]
 AfterDaccarett was decided, Congress deleted the reference to the Admiralty Rules from 21 U.S.C. § 881(b), which now provides that "[a]ny property subject to forfeiture to the United States under this section may be seized by the Attorney General in the manner set forth in section 981(b) of Title 18." 18 U.S.C. § 981(b)(2)(A) provides that a seizure may be made without a warrant if "a complaint for forfeiture has been filed in the United States district court and the court issued an arrest warrant in rem pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims." This statutory restructuring does not alter the substantive reality that admiralty practice as expressed by the Admiralty Rules is incorporated into the drug civil forfeiture statute.
 
 
 [12]
 Aurora also held that § 151 of the New York Debtor and Creditor Law impermissibly interfered with the uniformity of maritime attachment law in its interstate context, that being the second of the two prohibitions on state remedies articulated in American Dredging. In the present case, although TPI discusses uniformity at some length in its brief, the briefs for Winter Storm make it plain that it relies solely upon the prohibited effect of working prejudice to a characteristic feature of the general maritime law. One prohibited effect is sufficient for preemption, and the presence of that particular prohibited effect is manifest.